MIKULOVSKY, Plaintiff in error, v. STATE, Defendant in error.*

*No. State 72. Argued March 29, 1972.—Decided May 2, 1972.*
(Also reported in 196 N. W. 2d 748.)

* Motion for rehearing denied, without costs, on June 30, 1972.

For the plaintiff in error there was a brief by *Niebler & Niebler*, attorneys, and *George N. Kotsonis* of counsel, all of Menomonee Falls, and oral argument by *Mr. Kotsonis*.

For the defendant in error the cause was argued by *Michael R. Klos*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

CONNOR T. HANSEN, J.

*Issues.*

Three issues are presented on this appeal:

1. Did the juvenile court properly waive jurisdiction?
2. Was the defendant's written confession admissible in evidence?
3. Was it error to deny the petition for a writ of error *coram nobis?*

*Waiver of juvenile court jurisdiction.*

The waiver of juvenile court jurisdiction was based primarily on the testimony of Detective Donald Johnson who, on March 27, 1968, after advising the defendant of his constitutional rights, obtained a confession from the defendant, the substance of which is as follows: That on December 17, 1967, at approximately 2 a. m., defendant shot his mother twice between the eyes with a .22-caliber pistol while she was asleep in her bedroom; that when his father awoke to investigate, defendant fired at his father twice with a .357 magnum revolver, hitting him once in the back of the head; that he shot his father twice more with the .22-caliber pistol; that with the help of his brother John, the bodies were carried to the basement and the evidence of the shooting was

covered up; that on December 20, 1967, defendant and his brother took a cab to a dump located in the city of Glendale where they dug graves; that later that evening they wrapped the bodies of their parents in plastic bags and placed them in a box which they put in the trunk of the family car; that they then procured the help of a friend to drive them to the dump on the pretense that they were burying a deer which their father had struck on the highway; and, that the bodies were then placed in the graves and the box was burned at the dump. The .22-caliber pistol was later recovered from the U. S. Treasury Department, it having been confiscated from John in February of 1968. The .357 magnum revolver was recovered from the Flintrop Arms Company where John had traded it for two carbines. Detective George Reshel, who participated in the investigation, related that his testimony would be substantially the same as that of Detective Johnson.

In determining whether or not to waive juvenile jurisdiction, the court analyzed the above testimony in light of the eight criteria for waiver found in *Kent v. United States* (1966), 383 U. S. 541, 566–568, 86 Sup. Ct. 1045, 16 L. Ed. 2d 84: [3]

". . . *One*, the seriousness of the alleged offense to the community and whether the protection of the community requires waiver. Analyzing the first criteria by the facts in this case, there is testimony from Detective

[3] These criteria were promulgated by the juvenile court judge in the District of Columbia as a policy memorandum dated November 30, 1959. The Juvenile Court Act in the District of Columbia allowed the judge to waive jurisdiction "after full investigation" but set forth no guidelines or standards for the exercise of this discretion. The memorandum had been rescinded at the time *Kent* was decided. *See Kent v. United States, supra,* page 546, fn. 4. Although the court in *Kent* did not expressly adopt these criteria, the fact that they are appendixed to the court's opinion suggests their appropriateness as guidelines for juvenile court waiver proceedings.

Johnson that one of the murder weapons was confiscated by the federal government from the brother of this boy in February of this year after the murder was committed. There is further testimony that this murder weapon, the .357 magnum, was traded in at the Flintrop Arms Company, gun company, for two rifles. The description by the officer indicates that there is a continuing inclination on the part of the both boys to continue their associations with guns to the danger, not only of themselves, but to the entire community. The Court so finds. *Two,* whether the alleged offense was committed in an aggressive, violent, premeditated or willful manner. The Court finds that all four criteria exist. *Three,* whether the offense was committed against persons or against property. The record speaks for itself. This was a violent crime committed, allegedly, by the defendant herein. No greater offense can be imagined. *Four,* the prosecutive merit of the complaint; that is, whether there is evidence upon which a grand jury may be expected to return an indictment. The Court finds from the testimony of Officer Johnson, corroborated by Detective Groschel [Reshel], that there is prosecutive merit in this case. *Five,* the desirability of trial and disposition of the entire offense in one court with the juvenile associates in the alleged offense, who will be charged with a crime. The participation with an adult brother has been described in the testimony of Detective Johnson, corroborated by the testimony of Detective Groschel [Reshel] ; all five elements, therefore, are present at this time. *Six,* the sophistication of the juvenile. This crime was committed in a most sophisticated manner with great stealth, with great cunning, and, apparently, with great premeditation. The body was concealed. There was great planning in the disposing of the bodies and concealing from the friend, apparently, the nature of the offense. He was told that they were going to bury a deer. The record and previous history of the juvenile, including previous contacts with the Youth Aid Division or other law enforcement agencies and juvenile court and prior periods of probation to this court or prior contacts or commitments to juvenile institutions, *No. 7,* is taken into consideration in the context of the previous findings of this court. There is no previous record of the juvenile. The juvenile courts nationally have been

admonished by the President's Crime Commission in the report of February, 1967, to consider the offenses for what they are; that less weight in the future shall be given by juvenile courts to a history of offenses, but that the offense be viewed in its proper proportion, according to the magnitude and social impact and jeopardy that it may or have caused. The Court views criteria No. 7 in the context of modern juvenile court thinking. *Eight,* the prospects for adequate protection of the public and the likelihood of rehabilitation of the juvenile by use of procedures, services, and facilities currently available to the juvenile court. The lack of remorse, which is evident by this heinous crime, has shocked this Court to its roots. There is no apparent indication by actions described by Detective Johnson of this juvenile of a desire to cease and desist from his contacts with weapons as indicated in his attempt to trade the .357 magnum to the Flintrop Gun Company for two rifles. The Court, weighing this with great severity in its decision, taking the first six criteria in context as the Court has previously determined, the Court does not feel that the three-month period of activity of this juvenile indicates a condition of mental question. What has been described is a premeditated, brutal crime committed in concert with an older brother—an adult —and a third party—a friend who was used in the disposition of the bodies. At this time, motion for defense counsel will be denied. The motion of the district attorney to waive this case into the adult court is granted. The defendant herein is ordered waived to the district attorney, the sheriff to escort the defendant to the district attorney for prosecution in the adult court with his brother. The Court believes that the adult court can afford equally well as the juvenile court the processes of a mental inquiry if that be desired prior to the trial; and, that this case would best be tried in the adult court under the concurrent jurisdiction of those processes. . . ." [4]

---

[4] Defendant had requested a mental inquiry prior to waiver. The juvenile court reserved ruling thereon until the testimony had been presented. The motion was denied following the court's decision to waive jurisdiction.

Sec. 48.18, Stats., grants the juvenile court discretion to waive jurisdiction over a person sixteen years of age or older who has allegedly violated a state law, a county ordinance or a municipal ordinance "if the juvenile court judge deems it contrary to the best interest of such child *or* of the public to hear the case and enters an order waiving his jurisdiction. . . ." (Emphasis supplied.) [5] While the paramount consideration in juvenile court proceedings is the best interest of the child, this interest must be balanced against the interest of the public. Section 48.01 (3). Although rehabilitation and treatment constitute the underlying philosophy of juvenile law, a youthful offender is not totally immune from criminal responsibility. *See Winburn v. State* (1966), 32 Wis. 2d 152, 145 N. W. 2d 178. In allowing juvenile courts to waive jurisdiction in cases involving minors between the ages of sixteen and eighteen, the legislature has removed the protective shield against criminal responsibility for those individuals who, in the court's opinion, would more appropriately be dealt with as an adult. In the instant case, the juvenile court found that it would be contrary to the best interest of the defendant or the public to hear the matter in juvenile court after a proper examination of relevant criteria on this issue.

Defendant argues that before a proper waiver could be made, the juvenile court was obligated to hear testimony from social workers and child psychologists directed to the questions of defendant's prospects for rehabilitation and propensity for committing similar crimes in the future. While there are situations when testimony of this nature might be appropriate, it is

[5] *See* Buss, *Waiver of Jurisdiction in Wisconsin Juvenile Courts,* 1968 Wisconsin Law Review, 551, for a discussion of the various criteria that have been adopted by juvenile court judges in this state.

not mandatory in all cases. Here, the court carefully considered the fact that the defendant had no prior contacts with juvenile authorities but that the serious nature and circumstances surrounding the offenses outweighed the absence of a history of prior offenses. The court adhered to the due process standards announced in *Kent v. United States, supra,* by conducting a hearing where defendant was represented by counsel. The court articulated the reasons for its waiver of jurisdiction. We conclude that the juvenile court properly exercised discretion in waiving jurisdiction.

*Admissibility of defendant's written confession.*

The confession of the defendant followed a two-day police investigation into the whereabouts of his parents. The following is a resumé of the testimony taken at a *Goodchild* hearing.

On March 25, 1968, the dead woman's two sisters went to the detective bureau of the Milwaukee police department and complained that they hadn't heard from their sister since prior to Christmas of 1967. They had been informed by the defendant and his older brother, John, that the parents were in California. One of the women had remarked that someone might have done away with the parents. Detectives Douglas Zellmer and Gerald Tomaszewski then proceeded to the Mikulovsky home with the two women. Detective Zellmer testified that they arrived at the home at approximately 8:30 p. m. where they found the defendant at home with a younger brother, Michael. On cross-examination, Detective Zellmer testified that they talked to the defendant for approximately one-half hour to forty-five minutes, part of which time was spent in the kitchen of the home and part of the time outside in the squad car because the house was filthy and it smelled. Detective Tomaszewski, called by the defense, testified that they arrived at the Mikulovsky home at approximately 7:30

p. m. and were invited into the house by the defendant. They questioned him for approximately twenty minutes in the kitchen. He did not observe the defendant being questioned in the squad car on that evening. The defendant informed the officers that his parents were in California and that his brother John had received letters from them. Defendant himself did not know where the letters were, nor did he know his parents' address. The officers left a message with the defendant to have John call them when he returned home. At approximately 11 o'clock that evening, Detective Zellmer received a phone call from John. John testified the officers requested him to come down to the station and bring the letters he had received from his parents. He arrived at the station at approximately 11:30 that evening in the company of a friend. He informed the officers that everything was fine, and that his parents had gone to California to find work and would return to pick up the children. At that time he presented a letter from an attorney describing one of the aunts as a troublemaker and trying to break up his parents' marriage. The officers requested John to return the following day at 4 p. m. with the letters so they might determine the whereabouts of his parents.

The following day, March 26, 1968, John returned to the detective bureau at approximately 4 p. m. He informed Officers Zellmer and Tomaszewski that he was not able to locate the letters but that he would return home and continue to look. He stated that he thought his parents were in Los Angeles and he gave the officers the addresses of relatives who lived in Wisconsin, Florida and Illinois. John agreed to return home and continue looking for the letters. The officers advised him they would stop by later that evening. Detective Zellmer testified that John was questioned for approximately forty-five minutes. John, however,

testified that he remained at the police station and was questioned from 4:30 p. m. until approximately 9 p. m. when the officers accompanied him home; and, that during the course of this questioning, the officers stated that something was wrong and that he was probably responsible.

Officer Zellmer then contacted the relatives whose names were furnished him by John, and he was informed by them that they hadn't heard from the Mikulovskys since December of 1967. He also contacted Mr. Mikulovsky's employer who informed him that Mr. Mikulovsky left work on a Friday and failed to return the next day; that he was entitled to $400 in back pay which was never claimed; that he had not left any forwarding address; and, that no inquiries had been made concerning his employment. Officer Zellmer also contacted the attorney who had written the letter presented by John and was informed that he had had no recent contact with the Mikulovskys.

At approximately 8 o'clock that evening, Detectives Zellmer and Tomaszewski proceeded to the Mikulovsky home. Upon arrival there, they were informed by John that he was still unable to find the letters and at his request the officers began to help him look. The detectives then notified Sergeant Rudolph Will who, along with Detectives Vincent Partipilo and Thomas Thelen, arrived at the home at approximately 10 p. m. Following the arrival of the additional detectives, defendant's sister, Lucille, was called and brought to the home. Defendant's younger brother, Michael, appeared to be sick and the officers thought it best that Lucille take Michael home with her. When Lucille arrived at the home she was questioned with regard to the whereabouts of her parents. Detective Zellmer testified she informed the officers she hadn't seen her parents since December of 1967, but that her father had often mentioned going to California. She further stated that John had advised her

of letters he had received from their parents from California.

Lucille testified that she arrived at her parents' home at approximately 11 p. m. in response to a request by police officers to assist in locating her parents and to take Michael from the home. The officers had informed her that if she didn't take Michael home with her that he would be placed in an orphanage. Upon her arrival she observed either the defendant or John standing in the yard. She was questioned as to the whereabouts of her parents and also asked to look around the house to determine whether anything was missing. She observed that all of her mother's coats were there, which fact, she remarked, seemed unusual. She also observed that one of the beds was missing. During the time she was questioned, the defendant and John were outside. The detectives told her that they wanted to talk to her alone and at one point prevented John from entering the house. She remained at the home for approximately an hour to an hour-and-one-half.

Lucille further testified that the detectives never asked her anything about her brothers; nor stated any suspicions about them, nor implied that they had given false information. None of the detectives' questions ever implied that her parents had been killed. She was not shown any guns, nor did she observe any of the officers remove any guns from the house. Thereafter, Detectives Zellmer and Tomaszewski escorted her and Michael to her apartment. The two detectives then returned to police headquarters and filed a missing persons report.

The detectives testified that a search was made of the house at the express request of John in an effort to locate the letters. John was helping the detectives in this search while the defendant for the most part was either seated or was wandering about the kitchen. The conversations the detectives had with the boys related solely to the whereabouts of the parents and the search was

focused on attempting to find any papers or records from which the location of the parents could be ascertained. The search disclosed two guns which were taken by the officers for safekeeping. These were not the same guns as those used in the shooting of Mr. and Mrs. Mikulovsky. Also some papers were given to the officers by John and the defendant relative to the whereabouts of their parents. It appears that two of the detectives had been present at the Mikulovsky home during February of 1968 when a number of guns had been confiscated by the treasury department. However, the officers testified that this fact aroused no suspicion that either of the boys had committed a crime.

John testified that both he and the defendant were questioned extensively and that when his sister arrived he was taken out in the back yard and the defendant was taken out in the front yard. The officers accused both him and the defendant of killing their parents. He was further asked whether he had buried his parents in the back yard; whether he had used a chopping block in the basement to chop them up; and whether he had fed them to the dog. He denied that any guns were taken but testified that the officers had taken a cancelled check and a statement of his father's retirement without his consent. The detectives denied that any such statements were made to the boys and testified that no suspicions were formed as to whether or not the boys were telling the truth.

Later that evening, Detective Will placed a phone call to the Miller Brewery in California to ascertain whether Mr. Mikulovsky had taken employment there. The office was closed and he was advised to call the following day. The call was placed in response to information furnished him by the boys that their father might have sought employment there.

March 27, 1968, at approximately 7 a. m., Detectives Edwin Cornell and William Fender went to the Mikulovsky home. They conversed with John about the letters for approximately ten minutes and then asked the boys if they would like to come down to the detective bureau and help in the investigation of their missing parents. The boys were specifically advised that they did not have to come and that they would be free to leave at any time. The defendant indicated he was going to vocational school that morning and that he might leave for school from the detective bureau. The boys stated they would like to have breakfast first and the detectives waited for them in the car for approximately ten to fifteen minutes.

Upon arriving at the detective bureau, defendant and John were seated together in an interrogation room where the detectives conversed with them for fifteen to twenty minutes in regard to the whereabouts of their parents. John stated his parents left one morning prior to Christmas in a cab while he was still in bed. He did not know if they went by train or bus. Defendant did not say anything at that time. Detective Cornell reported this information to Detective Reshel and since he had finished his tour of duty, he then went home. The boys were not questioned from information contained in any reports, nor were any pictures shown to them. Detective Cornell further testified that when he left, the boys were seated in the room, the door was left unguarded and no arrest had been made.

Detective Captain Reshel testified he was told by Detective Cornell that the two boys had come to the detective bureau voluntarily to assist in the investigation of their missing parents. He was specifically advised that they had come down of their own free will; that they would be permitted to leave at any time; and, that they were not under arrest, but only aiding in the in-

vestigation. At Cornell's request, Reshel assigned two teams of detectives to the investigation and fully explained to them the status of the two boys.

Between 9 and 9:30 a. m. Detectives Donald Johnson and Norbert Bednarek began interviewing John and the defendant. Detective Johnson testified that at the outset he informed the boys they were not under arrest and that their assistance in locating their parents was appreciated. He also told them they could leave any time they wished. He inquired of the defendant if he wanted to go to school but defendant replied he wanted to stay and help in the investigation. During the course of interviewing, the boys would furnish names and locations in California where their parents might be located. Both detectives left the room numerous times to check out the information and to conduct other interviews. Also, John and the defendant frequently left the room to go to the toilet or to get a drink of water. No one went with them. At approximately 10 or 10:30 a. m., Detective McHugh came to assist them and took John into an adjoining room. Detectives Johnson and Bednarek continued to question the defendant. Nothing was discussed with the defendant other than the missing status of his parents. At no time were any pictures of dead persons displayed to the defendant, nor was there any suspicion or implication that a crime had been committed or that the Mikulovskys were dead. Detective Johnson did, however, suspect that the defendant had been providing false information.

At lunch, Detective Johnson discussed the investigation with the other officers involved and wrote out a summary report. Lunch was obtained from a nearby restaurant for the boys and they ate together in one of the interviewing rooms. The boys paid for their own meals. After lunch Detective Johnson left with John for the Mikulovsky home. John had made a request to be taken home so he could let the dog out. He also gave permission

to search the home in an attempt to locate the letters and any other helpful addresses in California. They left somewhere between one and two in the afternoon.

During lunch, Detective Captain Reshel reviewed all the information that they had obtained from the detectives who had interviewed the defendant and from the defendant's sister and aunts. Shortly after 2 p. m., Detective Reshel entered the room where the defendant was seated and introduced himself. He then reviewed all of the information that had been obtained and asked the defendant if there was anything he could add at that time. Defendant stated that he had nothing else to add. Detective Reshel then remarked something to the effect that since he and the defendant were both of the same religion, a little prayer at this time for the welfare of his parents would probably help. At that point, Detective Will entered the room and sat down. Defendant then dropped his head, tears came to his eyes and he stated that he killed his parents. Detective Reshel then informed the defendant he was under arrest and thoroughly advised him of his constitutional rights. Defendant then proceeded to give the officers a more detailed statement. That afternoon defendant accompanied a number of detectives to the Glendale dump and located the graves of his parents. After returning from the gravesite, Detective Johnson asked the defendant if he would give a written statement. At 5:40 p. m., defendant was again advised of his rights and commenced writing a confession. The confession was signed and witnessed at 7:40 p. m. During this time the defendant did nothing else but write on the document, except for a brief period of time when Detective Thelen asked him about some guns.

John testified that he and the defendant were picked up on the morning of March 27th at approximately 7 a. m. The detectives said they would like them to come down to the detective bureau. The boys got dressed but did not finish eating. Upon arriving at the bureau, he

was placed in an interrogation room by himself where two detectives immediately began questioning him. During the entire morning, he and the defendant were in separate rooms except for a period of five minutes. He overheard the detectives shouting at the defendant and accusing him of killing his parents. The same accusation was directed toward himself. At one time he was refused permission to go to the toilet and was told that he could not move. He was never advised that he could leave. During lunch, he was not with the defendant but in the company of three detectives. He denied that he paid for his own lunch. After lunch, he was taken home and told to remove the dog from the basement so that a search could be made. The detectives stated that they were going to start digging up the basement. Defendant testified briefly that after lunch on March 27th, Detective Johnson showed him a picture of his mother and a morgue picture of a dead woman that resembled his mother. In reference to the latter picture, he was asked if this was how his mother now looked.

At the conclusion of all the testimony, the court made extensive findings of fact. The court found, beyond all reasonable doubt, that there was no deprivation of liberty in any significant way of either the defendant or John until the defendant's arrest by Detective Reshel; that no custodial interrogation occurred prior to the time defendant confessed; and, that the defendant was free to leave the detective bureau at any time. The court further found that the defendant was fully and adequately advised of all his constitutional rights at the time of the confession and that no advice was necessary prior thereto. Also, that from the totality of the circumstances, defendant's oral and written statements were voluntarily given and were not the result of any psychological coercion or pressure. This court has held that the trial court's findings in a *Goodchild* hearing will not be upset

unless they are contrary to the great weight and clear preponderance of the evidence. *McClellan v. State* (1972), 53 Wis. 2d 724, 193 N. W. 2d 711; *Sharlow v. State* (1970), 47 Wis. 2d 259, 177 N. W. 2d 88; *State v. Herrington* (1969), 41 Wis. 2d 757, 165 N. W. 2d 120.

Defendant contends that his confession was inadmissible at trial under the rule of *Miranda v. Arizona* (1966), 384 U. S. 436, 86 Sup. Ct. 1602, 16 L. Ed. 2d 694, because he was placed in custody on the morning of March 27, 1968, and thereafter interrogated without being advised of his constitutional rights.

*Miranda v. Arizona, supra,* page 444, defines "custodial interrogation" as ". . . questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." The court remarked in footnote 4 of the opinion that this is what was meant in *Escobedo v. Illinois* (1964), 378 U. S. 478, 84 Sup. Ct. 1758, 12 L. Ed. 2d 977, where the court defined the critical stage in the investigatory process to be where the inquiry had focused on an accused who had been taken into custody. After an extensive discussion of the actual and potential abuses resulting from police custody, the court in *Miranda* described situations where the decision would not apply:

"Our decision is not intended to hamper the traditional function of police officers in investigating crime. See *Escobedo v. Illinois,* 378 U. S. 478, 492. When an individual is in custody on probable cause, the police may, of course, seek out evidence in the field to be used at trial against him. Such investigation may include inquiry of persons not under restraint. General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. It is an act of responsible citizenship for individuals to give whatever information they may have to aid in law enforcement. In such situations

the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." *Miranda v. Arizona, supra,* pp. 477, 478.

The *Miranda* court was primarily concerned with inter-rogation which occurred at the police station. However, the fact that a person is questioned at a police station does not, in itself, establish *custodial* interrogation. *United States v. Tobin* (8th Cir. 1970), 429 Fed. 2d 1261; *Hicks v. United States* (D. C. Cir. 1967), 382 Fed. 2d 158; *People v. Burris* (1971), 49 Ill. 2d 98, 273 N. E. 2d 605. *"Miranda* is made applicable to 'an in-dividual *held* for interrogation.' (Emphasis supplied.)"; *Roney v. State* (1969), 44 Wis. 2d 522, 530, 171 N. W. 2d 400. In *Huebner v. State* (1967), 33 Wis. 2d 505, 516, 147 N. W. 2d 646, this court discussed the term custody as it relates to arrest:

"... We think a law-enforcement officer may tempo-rarily stop a person and request him to furnish informa-tion, to respond to questions or to appear at the police station without arresting such person or without such re-quested cooperation being considered an arrest. How-ever, it must be made plain to the person he is not under arrest and there is no legal obligation to comply with the request to appear at the station, and the act of the person must be voluntary and uncoerced. However, if the law-enforcement officer by order or conduct indicates the per-son is obliged to remain in the officer's presence or to come to the police station, such person is for practical purposes arrested because of the imposition of the will of the police officer over the freedom of the person. The central idea of an arrest is the taking or detaining of a person by word or action in custody so as to subject his liberty to the actual control and will of the person making the arrest. *State v. Phillips* (1952), 262 Wis. 303, 308, 55 N. W. (2d) 384. The same result is reached by a volun-tary submission to such custody. But there must exist the intent to take into custody and a corresponding under-standing by the person arrested that he is in 'custody,' al-

though no formal declaration of arrest is required. 5 Am. Jur. (2d), Arrest, p. 695, sec. 1. *Peloquin v. Hibner* (1939), 231 Wis. 77, 84, 285 N. W. 380. . . ."

In the instant case there was sufficient credible testimony to support the trial court's finding that defendant and his brother appeared voluntarily at the station and were advised they were free to leave at any time. In the absence of other circumstances, this finding supports the conclusion that the defendant was not in custody.

Considering the circumstances surrounding the defendant's presence at the police station and the object of the detective's questioning, the view is further supported that the defendant was not under custodial interrogation. The entire investigation indicates a legitimate concern as to the whereabouts of the boys' parents. Defendant and his brother had repeatedly informed the officers that their parents were in California and that they had received letters from them. The boys were the only source of knowledge from which an investigation could be made of the missing persons. Neither of the boys were suspected of any crime, much less were the officers aware that any crime had been committed. In *Miranda*, the court abandoned the test of whether or not an investigation has focused on an accused and adopted the test of whether or not at the time of questioning an individual was in custody regardless of the reason for custody, *United States v. Bekowies* (9th Cir. 1970), 432 Fed. 2d 8; *Mathis v. United States* (1968), 391 U. S. 1, 88 Sup. Ct. 1503, 20 L. Ed. 2d 381, and regardless of where custody occurs. *Orozco v. Texas* (1969), 394 U. S. 324, 89 Sup. Ct. 1095, 22 L. Ed. 2d 311. However, *Miranda* only prohibits the type of interrogation which is designed to either directly or indirectly elicit incriminating statements, absent the giving of prior warnings. In this regard, whether an individual has been accused of a crime

and whether the police officers know or have reason to believe that a crime has been committed, are facts relevant to determining the absence or presence of "custodial interrogation." *Roney v. State, supra,* pages 530, 531. In the instant case there was no evidence or implication that a crime had been committed or that the defendant was involved. The findings of the trial court that defendant was not under custodial interrogation are not against the great weight and clear preponderance of the evidence.[6]

*Writ of error coram nobis.*

Following his conviction, defendant petitioned the trial court for a writ of error *coram nobis.* In support of the petition are various affidavits of defendant's attorney, John Mikulovsky, and a private detective. The substance of the petition is that on March 8, 1969, subsequent to defendant's conviction, John gave a 60 page, stenographically recorded, confession in which he states that he alone was responsible for the death of his parents and that the defendant was not home at the time. The confession is in question and answer form, and elaborates in detail the circumstances surrounding the murders. It appears that the confession resulted from, and was initiated by, John's expression of a desire to fully explain what had happened. He was serving a ten-year sentence at the time, apparently on a conviction unrelated to the instant case. It also appears that John made the confession with full knowledge of the consequences thereof and is now being charged with two counts of first-degree murder (party to a crime). Oral arguments were heard and the petition was denied by the trial court March 17, 1969.

On appeal, it is argued that the statements and confession of the defendant and the confession of his brother John are mutually exclusive, each brother reciting that

---

[6] It is noted that neither John nor the defendant testified at the trial.

they alone committed the offense without the assistance of the other. Defendant urges this court to issue the writ of *coram nobis,* vacate his conviction and remand the case for further proceedings.

In order to grant a writ of error *coram nobis* there must be shown the existence of an error of fact which was unknown at the time of trial and which is of such a nature that knowledge of its existence at the time of trial would have prevented the entry of judgment. *State v. Randolph* (1966), 32 Wis. 2d 1, 144 N. W. 2d 441; *State v. Kanieski* (1966), 30 Wis. 2d 573, 141 N. W. 2d 196; *Houston v. State* (1959), 7 Wis. 2d 348, 96 N. W. 2d 343. In *Houston v. State, supra,* page 350, this court thoroughly delineated the scope of the writ:

> "The writ of *coram nobis* is a discretionary writ addressed to the trial court. Its principal aim is to afford the trial court an opportunity to correct its own record of an error of fact not appearing on the record, and which alleged error would not have been committed by the court had the matter been brought to the attention of the trial court. 2 R. C. L., p. 305, sec. 259. *In re Ernst* (1923), 179 Wis. 646, 192 N. W. 65, 30 A. L. R. 681. Where an error or question of fact appears on the record such question under our practice may be raised by writ of error. Where there is a remedy afforded by a writ of error or by appeal the writ of *coram nobis* will not lie. Likewise where the writ of *habeas corpus* affords a proper and complete remedy the writ of *coram nobis* will not be granted. *State v. Turpin* (1949), 255 Wis. 358, 38 N. W. (2d) 495. On an application for a writ of *coram nobis* the merits of the original controversy are not in issue and such a writ cannot be used for the purpose of obtaining a new trial on the grounds of newly discovered evidence relating to matters litigated at the trial. *In re Ernst* (1923), 179 Wis. 646, 192 N. W. 65."

In the instant case, the trial court found, from the totality of the circumstances, that defendant's written and oral statements were freely and voluntarily made. Although the defendant testified that he was shown morgue pictures of dead women resembling his mother, this con-

tention was denied by the detective involved. The statement made to the defendant by Detective Reshel, in regard to the appropriateness of a prayer for the welfare of his parents, under the circumstances, does not demonstrate that the defendant was psychologically coerced, rendering his confession involuntary. The trial court's findings of voluntariness are not against the great weight and clear preponderance of the evidence. *Krueger v. State* (1972), 53 Wis. 2d 345, 355, 356, 192 N. W. 2d 880; *Britton v. State* (1969), 44 Wis. 2d 109, 115, 170 N. W. 2d 785. Furthermore, the jury passed on the credibility and trustworthiness of defendant's written confession. Had there been no confession by the defendant, a different situation would be presented. The evidence presented in the instant case, however, constituted newly discovered evidence affecting only the credibility of the defendant's confession. Such evidence is not within the scope of a writ of error *coram nobis*.

It cannot be said that the trial court abused its discretion in denying the petition for a writ of error *coram nobis*, and this court likewise declines to issue such a writ.

Finally, defendant argues that at the time of the hearing on the petition, the district attorney was under a duty to disclose to the court and to defense counsel the recorded confession of John. However, it appears that defense counsel was fully aware of the confession and its contents prior to the hearing, as evidenced by references thereto in the various affidavits submitted to the trial court. Furthermore, the record does not disclose, nor is it alleged on appeal that defense counsel made any request for the written statement. The instant case does not approach the situation where the state fails to disclose or suppress material evidence in violation of defendant's right of due process. *State v. Cole* (1971), 50 Wis. 2d 449, 184 N. W. 2d 75; *Britton v. State, supra,* pages 116–118.

*By the Court.*—Judgment and orders affirmed.