531 So.2d 154 (1988)
Robert Anthony PRESTON, Petitioner,
v.
STATE of Florida, Respondent.
Robert Anthony PRESTON, Petitioner,
v.
Richard L. DUGGER, Etc., Respondent.
Nos. 73062, 73067.
Supreme Court of Florida.
September 22, 1988.
*155 Larry Helm Spalding, Capital Collateral Representative and Billy H. Nolas, Staff Atty., Office of the Capital Collateral Representative, Tallahassee, for petitioner.
Robert A. Butterworth, Atty. Gen., and Margene A. Roper, Kellie A. Nielan and Sean Daly, Asst. Attys. Gen., Daytona Beach, for respondents.
PER CURIAM.
Robert Preston was tried and convicted of first-degree murder in June 1981. The judgment and sentence of death were affirmed. Preston v. State, 444 So.2d 939 (Fla. 1984). His scheduled execution was stayed pending the resolution of a motion for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.850. Following an evidentiary hearing, the trial judge denied Preston's motion. That ruling was affirmed by this Court in Preston v. State, 528 So.2d 896 (Fla. 1988). One of Preston's arguments in that appeal was that the judge should have reopened the evidentiary hearing to permit the introduction of recently discovered evidence. In addressing this argument, we said:
In this appeal, appellant raises a myriad of issues, some of which are predicated upon the motions which were filed after the evidentiary hearing and which sought to inject new issues into the case. Under the circumstances, the judge properly declined to rule on these issues, and they will not be further addressed in this opinion. To the extent, if any, that the content of such motions reflects newly discovered evidence tending to exonerate appellant, this may be presented through the filing of a motion for writ of error coram nobis.
Id. at 898.
Following the issuance of a new death warrant, Preston has now filed in this Court an application for leave to file petition for writ of error coram nobis and a request for stay of execution. He has also filed a petition for writ of habeas corpus. We have jurisdiction under article V, sections 3(b)(1) and (9) of the Florida Constitution.
In reviewing the application for leave to file petition for writ of error coram nobis, it becomes necessary to consider the evidence introduced at trial. While an outline of the facts is contained in our original opinion, a more detailed recitation is set forth below.
Earline Walker, who was working as a night clerk at the Li'l Champ convenience store in Forest City, was noticed missing at approximately 3:30 a.m. on the morning of January 9, 1978. All bills had been removed from the cash register and the safe, and it was subsequently determined that $574.41 had been taken. Walker's automobile was found later that day parked on the wrong side of the road approximately one and a half miles from the Li'l Champ store. Thereafter, at about 1:45 p.m. of the same day, Walker's nude and mutilated body was discovered in an open field adjacent to her abandoned automobile.
*156 Preston lived with his brothers, Scott and Todd, at his mother's home which was located about one-quarter of a mile from the field in which Walker's body was found. Scott Preston testified that he spent the evening of January 8, 1978, at the house with his brothers and his girlfriend, Donna Maxwell. At about 11:30 p.m., he retired to the bedroom with Donna. About an hour later, Robert knocked on the door, asking Scott to go with him to the Parliament House "to get some money." When Scott declined, Robert asked one of them to help him inject some PCP. After Scott and Donna refused to do so, they heard the door slam as Robert left the house. At about 4:30 a.m., Robert returned and asked them to come to the living room where he was attempting to count some money. Because he "wasn't acting normal," they counted the money for him, which came to $325. Robert told them that he and a friend, Crazy Kenny, had gone to a gay bar called the Parliament House where they had hit two people on the head and taken their money. Scott and Donna went back to bed. Donna gave similar testimony concerning Robert's actions. She also said that shortly before 9:00 a.m., Robert returned and told her that he had heard that a body of a woman who worked in a store near their house had been discovered in a field.
The head security guard at the Parliament House testified that he observed no disturbance nor was any disturbance reported to him at that establishment during his shift which began in the early evening on January 8 and ended at 5:00 a.m. on January 9. There was no police report of any incident at the Parliament House on January 9, 1978.
A woman returning home from her late night job at about 2:20 a.m. saw Preston wearing a plaid CPO jacket at a location near the vacant lot where Walker's body was found.
Preston was arrested the day following the murder on an unrelated charge. As part of the booking process, his personal effects, including his belt, were removed, and his fingerprints were taken. A pubic hair was discovered entangled in Robert's belt buckle. A microscopic analysis of the hair together with another one discovered on his jacket indicated that they could have originated from Walker's body.
Blood samples were taken from the victim and from Preston and compared with two blood stains found on Preston's CPO jacket. The blood samples were compared as to eight separate factors, including type, Rh factor, and enzyme content. The sample from the coat and the victim matched in all eight tests, while Preston's blood did not match in three. An expert opined that the blood on the coat could not have been Preston's but could have been the victim's. He also testified that only one percent of the population would have all eight factors in their blood.
Several detached food stamps were also found in Preston's bedroom pursuant to a consent search authorized by his mother. As a result of a fracture pattern analysis, an expert witness testified that these coupons had been torn from a booklet used by Virginia Vaughn to make purchases at the Li'l Champ food store several days before the murder. Vaughn testified that at the time of her purchase the coupons had been placed either in the cash register or the safe.
Five usable latent fingerprints and palm impressions were obtained from Walker's automobile and were identified as having been made by Preston. One of these was from a cellophane wrapper of a Marlboro cigarette pack found on the front console. The other prints were located on the door-post and the roof of the car.
Preston took the stand in his own behalf. He agreed that he was at his mother's house in the company of his brothers and Donna Maxwell the night of January 8. However, he said he had injected PCP and had no recollection of what occurred during the middle portion of the night. He did recall trying to count some money and had some recollection of going to the Parliament House in a car driven by Crazy Kenny. Preston denied having touched Walker's abandoned automobile. He also said that he had not been in the vicinity of *157 the Li'l Champ store for approximately six months before the murder. He testified that the food stamps discovered in his room were found by him on a path behind the Li'l Champ store on the morning of the murder when he went there to purchase cigarettes. He admitted talking to Donna Maxwell regarding the discovery of the store clerk's body but said that the conversation did not occur until about 3:30 to 4:30 p.m.
The newly discovered evidence proffered in the application for leave to file petition for writ of error coram nobis consists of four affidavits signed shortly following the evidentiary hearing on the motion for postconviction relief. One of these was by Steven Hagman, who said that while both of them were inmates at Lake Butler in 1980, Scott Preston told him that he had murdered the "Walker woman" and told him how he did it. According to Hagman, he wrote the Seminole County State Attorney concerning Scott Preston's statement and was interviewed by the assistant state attorney the following year concerning this matter.
In an affidavit by John A. Yazell, he said that he had known the Prestons from having lived in their neighborhood and that he was also incarcerated with Scott Preston at Lake Butler in 1980. He, too, said that Scott told him the details of how he had killed Earline Walker. Another neighbor, James MacGeen, stated that Scott told him after Preston's arrest that Scott admitted being involved in the murder. The fourth affidavit was given by Glenn Yazell, John Yazell's brother. He said he believed Scott was guilty of the murder because his brother, John, told him that Scott had confessed. Both MacGeen and Glenn Yazell testified for Preston at the hearing on the motion for postconviction relief but were not interrogated about the matters contained in their affidavits.
In Hallman v. State, 371 So.2d 482 (Fla. 1979), this Court discussed in depth the requirements of a writ of error coram nobis. Not only must the facts upon which the petition is based have been unknown to the defendant, there must also be a showing that they could not have been ascertained by the use of due diligence. At the outset, it would appear that at least the affidavits of MacGeen and the Yazell brothers do not meet this test because these persons were evidently neighborhood friends of the Prestons. Assuming, however, that this hurdle could be overcome and the facts recited in all the affidavits are accepted as being true, the next step is to evaluate the sufficiency of the application. On this issue, the Hallman court stated:
The general rule repeatedly employed by this Court to establish the sufficiency of an application for writ of error coram nobis is that the alleged facts must be of such a vital nature that had they been known to the trial court, they conclusively would have prevented the entry of the judgment. Williams v. Yelvington, 103 Fla. 145, 137 So. 156 (1931); House v. State, 130 Fla. 400, 177 So. 705 (1937); Baker v. State, 150 Fla. 446, 7 So.2d 792 (1942); Cayson v. State, 139 So.2d 719 (Fla. 1st DCA), appeal dismissed, 146 So.2d 749 (Fla. 1962). In Russ v. State, this Court expressly stated: "The showing must be such that if the matters shown had been before the trial court when judgment was entered, the court would have been precluded from entering the judgment." 95 So.2d 594 at 597 (Fla. 1957) (emphasis added). This traditional "conclusiveness test" in error coram nobis proceedings is predicated on the need for finality in judicial proceedings. This is a sound principle, for litigants and courts alike must be able to determine with certainty a time when a dispute has come to an end.
Id. at 485. Accord Darden v. State, 521 So.2d 1103 (Fla. 1988).
Thus, the fact that the jury might have reached a different result had it heard the newly discovered evidence does not meet the test for coram nobis. Gilliam v. State, 493 So.2d 56 (Fla. 1st DCA 1986) (third-party confession exonerating defendant did not warrant relief); Tafero v. State, 406 So.2d 89 (Fla. 3d DCA 1981) (third-party confession to crime and recantation of testimony *158 by important state witnesses to fourth party held insufficient). In Riley v. State, 433 So.2d 976 (Fla. 1983), the newly discovered evidence was in the form of an affidavit by Saia that he had been told by a fellow inmate, Ferguson, that he had committed the murders for which Riley was convicted. In rejecting the petition for leave to apply for a writ of error coram nobis, this Court said:
Applying the principles of Hallman, we cannot say that this evidence would conclusively have prevented Riley's convictions for first-degree murder and assault. See Tafero v. State, 406 So.2d 89 (Fla. 3d DCA 1981). Even if Saia had been present and testified at the trial that Ferguson had confessed to him that he had committed the murders, such evidence would not conclusively have prevented entry of judgments of conviction. The State's evidence still would have been sufficient to support the jury's verdicts of guilty. Therefore, the petition for leave to apply for a writ of error coram nobis is denied.
Id. at 980.
In Rolle v. State, 451 So.2d 497, 499 (Fla. 4th DCA 1984), approved, 475 So.2d 210 (Fla. 1985), the court analyzed the leading cases on the subject and explained the "conclusiveness" requirement of coram nobis as follows:
The rule that can be deduced from this line of cases is that newly discovered evidence, if true, must directly invalidate an essential element of the state's case. Riley, 433 So.2d at 980. For example, if the sole prosecution witness recants his testimony, the state would be left with no evidence, and the petition might be granted. Cf. Tafero, 406 So.2d at 93 n. 8 and 94 n. 11. In each of the cases cited above, the newly discovered evidence did not refute an element of the state's case; rather, the evidence, contradicted other existing evidence. Therefore, in each case, sufficient evidence to convict the petitioner remained even after the allegations in the petition, taken as true, were considered. Cf. Mikulovsky v. State, 54 Wis.2d 699, 196 N.W.2d 748 (Wis. 1972) where a third party confession was held not sufficient for coram nobis purposes because that confession merely affected the credibility of other independent evidence of the petitioner's guilt. In Riley, Justice Boyd, in dissent, conceded that, even accepting the existence of a third party confession, evidence remained to convict Riley. Boyd argued, however, that no jury could "conceivably" have convicted Riley upon this evidence. The majority, of course, did not accept this argument.
Measured by this standard, it is clear that Preston is not entitled to a petition for writ of error coram nobis. While the case against him was based on circumstantial evidence, it was nevertheless a strong case. The evidence concerning the fingerprints, the blood, and the food stamps was most persuasive. At best, if the newly discovered evidence had been known at trial, it could have been used to impeach Scott Preston and perhaps introduced under section 90.804(2)(c), Florida Statutes (1987). It would have put in question Scott Preston's credibility, but it would not have nullified his testimony. It would not have affected the testimony of Donna Maxwell, who fully corroborated Scott Preston's testimony. The force of the remaining evidence would have been undiminished. Thus, it cannot be said that the newly discovered evidence would have conclusively prevented entry of the judgment. Moreover, we are convinced that even under the standard advocated by Justice Overton in his dissent in Hallman, the existence of the newly discovered evidence in this case would not have "probably" caused the jury to find Preston innocent. Hallman, 371 So.2d at 489.
Preston's petition for habeas corpus raises seven claims, all of which are without merit:
(1) Appellate counsel was ineffective for not arguing that the state had violated the dictates of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to notify Preston's counsel that the police had discovered keys bearing the name of "Marcus A. Morales" in the victim's automobile. *159 Preston first made this contention in his motion for new trial which was denied. Preston next raised the issue in his motion for postconviction relief. In affirming the denial of his motion, this Court did observe that the issue was procedurally barred because it could have been raised on direct appeal. However, we noted that "[e]ven if there were no procedural bar, the court did not abuse its discretion in excluding evidence of the keys." 528 So.2d at 898. It is significant that at no time until the filing of MacGeen's affidavit stating that Morales was a local drug dealer who was friendly to Scott Preston was any effort made to show how the existence of the keys might be remotely relevant to his defense. Therefore, counsel cannot be faulted for not raising a point on appeal which would have clearly failed.
(2) The erroneous jury instruction that a verdict of life imprisonment must be made by a majority of the jury materially misled the jury. In Harich v. State, 437 So.2d 1082 (Fla. 1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1329, 79 L.Ed.2d 724 (1984), this Court rewrote that portion of the standard jury instruction complained of by Preston. We later held that there must have been an objection at trial before the issue can be raised on appeal and that Harich did not constitute a change in the law that would permit relief in collateral proceedings. Jackson v. State, 438 So.2d 4 (Fla. 1983). Because no objection was made to the offending instruction given at Preston's trial, appellate counsel was not ineffective for not having argued this point. The rationale of Mills v. Maryland, ___ U.S. ___, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), is inapposite to this issue.
(3) Appellate counsel was ineffective for failing to argue the trial court's erroneous use of misinformation in considering the aggravating and mitigating circumstances. This contention centers on an inadvertent reference in the sentencing order to a prior juvenile conviction of resisting arrest with violence when in fact the offense was resisting arrest without violence. This was probably a typographical error because prior to the rendering of the sentencing order the prosecutor pointed out to the judge that Preston's prior juvenile offense was without violence. In any event, even if it be assumed that there was a misapprehension on the part of the judge, it is clear that it could not have played a part in the ultimate sentencing. Because Preston had been convicted of the felony of throwing a dangerous missile into an occupied vehicle and admitted that he had used and sold drugs for many years, it is clear that he was not entitled to the benefit of the statutory mitigating circumstance of no significant history of prior criminal activity. Appellate counsel was justified in not raising this meritless issue.
(4) Preston's rights to a fair trial were violated by the trial judge's refusal to instruct the jury on insanity. This point was decided adversely to Preston on appeal. We held that the court properly declined to give the instruction because there was insufficient evidence of Preston's insanity.
(5) Appellate counsel was ineffective for failing to argue that the court erred in instructing the jury that an aggravating circumstance applicable to his case was that "the defendant has previously been convicted of ... another felony involving the use of violence to some person" and later that "the crime of throwing a deadly missile into an occupied vehicle is a felony involving the use of violence to another person." At the outset, we note that trial counsel did not object to the instruction, so the matter was not properly preserved. Therefore, the fact that appellate counsel did not raise this issue on direct appeal does not demonstrate deficient performance. Moreover, the issue is without merit. The jury was instructed that the aggravating circumstances which it might consider were "limited to any of the following that are established by the evidence." Because one of the essential aggravating factors for consideration was the prior conviction of a felony involving the use of violence to a person, it was proper to instruct the jury as a matter of law that throwing a deadly missile into an occupied vehicle was such a *160 felony. In closing argument, trial counsel even conceded that this aggravating factor had been proven through the presentation of evidence concerning the "deadly missile" conviction.
(6) Preston was deprived of his rights to an individualized sentencing because of impermissible victim impact information under the rationale of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440, reh'g denied, ___ U.S. ___, 108 S.Ct. 31, 97 L.Ed.2d 820 (1987). The so-called victim impact information referred to by Preston consisted of occasional references by the prosecutor to the character of the victim and her relationship to family and friends. Since there was no objection to any of these comments, the point is procedurally barred. Grossman v. State, 525 So.2d 833 (Fla. 1988), petition for cert. filed (U.S. July 25, 1988). Moreover, the evidence complained of cannot be viewed as the type of victim impact evidence condemned by Booth.
(7) The court's instructions unfairly shifted the burden of proof to the defendant with respect to aggravating and mitigating circumstances. Because there was no objection to the instruction complained of, the point was waived. Appellate counsel could not have been reasonably expected to raise the issue. In any event, when viewed as a whole, the instructions given by the court did not shift the burden of proof to the defendant. See Arango v. State, 411 So.2d 172 (Fla.), cert. denied, 457 U.S. 1140, 102 S.Ct. 2973, 73 L.Ed.2d 1360 (1982).
We deny the application for leave to file petition for writ of error coram nobis, the petition for habeas corpus, and the petition for stay of execution. No petition for rehearing may be filed.
IT IS SO ORDERED.
EHRLICH, C.J., and McDONALD, SHAW, GRIMES and KOGAN, JJ., concur.
OVERTON, J., concurs specially with an opinion, in which KOGAN, J., concurs.
BARKETT, J., did not participate in this case.
OVERTON, Justice, specially concurring.
I concur but remain firm in my view that the probability test for granting new trials on the basis of newly discovered evidence, as set forth in Florida Rule of Criminal Procedure 3.600(a)(3), should be applicable to petitions for writ of error coram nobis in death cases. See Hallman v. State, 371 So.2d 482 (Fla. 1979) (Overton, J., dissenting). I concur because I believe, even under that standard, the existence of the asserted newly discovered evidence in this case would not "probably have changed the verdict."
KOGAN, J., concurs.