707 So.2d 300 (1997)
James WALKER, Appellant/Cross-Appellee,
v.
STATE of Florida, Appellee/Cross-Appellant.
No. 84113.
Supreme Court of Florida.
September 4, 1997.
Rehearing Denied March 24, 1998.
*302 Bennett H. Brummer, Public Defender and Christina A. Spaulding, Assistant Public Defender, Eleventh Judicial Circuit, Miami, for Appellant/Cross-Appellee.
Robert A. Butterworth, Attorney General and Fariba N. Komeily, Assistant Attorney General, Miami, for Appellee/Cross-Appellant.
PER CURIAM.
We have on appeal the first-degree murder convictions and judgment of the trial court *303 imposing the death penalty upon James Walker. We have jurisdiction under article V, section 3(b)(1) of the Florida Constitution. We affirm all of Walker's convictions, as well as his sentences for the noncapital felony offenses, but remand for a new sentencing hearing before the trial court on the capital felonies where all nonstatutory mitigating factors established by the evidence will be considered and accorded appropriate weight in the sentencing process.

FACTS
The record reflects that at approximately 8 a.m. on Sunday, August 22, 1993, while responding to a reported brush fire in Sewell Park on South River Drive in Miami, firefighters found the body of a woman partially submerged in a canal on the north side of the park. Her wrists were bound together in front of her with duct tape and duct tape was also wrapped around her head, covering her mouth and eyes. Walker's fingerprint subsequently was found on the interior surface of the duct tape wrapped around the victim's head.
The following day, Metropolitan Dade County homicide detectives Thomas Watterson and Willie Everett issued a press release seeking help in identifying the body. In response to the request, Joseph Clark contacted the detectives and identified the body as that of his sister-in-law, Joanne Jones. Mr. Clark also informed police that the victim's car and her seventeen-month-old son, Quinton Jones, were also missing. Police later found the body of Quinton Jones in the canal, about twenty-five to thirty feet north of the location where Joanne's body had been found. Quinton's nose and mouth were also covered with duct tape. Mr. Clark and other family members informed the detectives that Ms. Jones had been having problems with James Walker, her ex-boyfriend, who worked as a bailiff at the Metro-Dade Justice Building. Ms. Jones had sued Walker to establish his paternity of Quinton and to obtain child support. Relatives also told police that Ms. Jones had accused Walker of sexually assaulting her.
On the morning of August 24, police received a phone call from Walker and asked him to come to the station house for questioning. Walker received permission to leave work and drove himself to Metro-Dade police headquarters. There, he was escorted to an interrogation room and advised of his Miranda rights. Walker executed a rights waiver form at 9:40 a.m.
Initially, Walker denied seeing Ms. Jones or his son on Saturday, August 21. He told police that he had last seen Ms. Jones the week before and had last been in her apartment about one week earlier when he took Quinton to play in a park. He stated he had been in her car on one or two prior occasions, the last time being about one month before. Walker explained that he had called Ms. Jones at about 8 a.m. on August 21, and made tentative plans to meet for a movie that evening. When Ms. Jones did not meet him at the theater, Walker called her and she said she would not be joining him. Walker told police that he then left the theater at 163rd Street in northern Dade County and, after first driving to his sister's home in Overtown, and then briefly visiting his mother at her home in Liberty City, he returned to his own home where he went to sleep for the night.
After Walker related this version of events to the officers, Detective Watterson asked Walker to sign a consent form for a search of his car, explaining, as Watterson later testified, that "we needed to look in the car and to examine it for any evidence." Watterson read the consent form to Walker, who initialed each paragraph, signed the form, and gave his keys to the officer. Walker also signed a form allowing the officers to take his fingerprints and photographs after being informed that his requested cooperation was voluntary. Detective Watterson falsely informed Walker that the police "had a very good fingerprint from the duct tape we had removed from the victim." Walker immediately became flushed and nervous and stated that he was not sure he wanted to sign the form. The officers returned the form to Walker and no prints or pictures were taken.
Because the officers did not believe Walker's story about the events of August 21, they continued to question him. Walker eventually told police that he had, in fact, seen Ms.
*304 Jones and Quinton on Saturday evening. Walker explained that the three of them had met at the movie theater when two armed men approached them and forced him into the back of Jones' car with Jones and the baby. The two armed men drove the car to the vicinity of the Orange Bowl where they ordered Walker to put duct tape on Ms. Jones. Walker told police that he obeyed and put duct tape over Jones' mouth and eyes.[1] Walker said the men then ordered him out of the car, threatening that they knew where he lived and would kill him if he said anything. The abductors drove off with Joanne and Quinton Jones still in the car and Walker never saw them again. Walker declined to offer an explanation when officers inquired as to how he had gotten home after being abandoned near the Orange Bowl and why he had not called the police to report the abduction. When Walker persisted in standing by the abduction story, the officers placed him under arrest for two counts of first-degree murder, and implored him to tell the truth. Watterson informed Walker that he wanted a stenographer to take down his "abduction" story. Walker responded to the effect, "If you do that, I want an attorney." Detective Watterson testified that he simply replied, "Okay, we won't do that." Detective Everett testified, however, that before the interrogation continued, Walker was asked whether he wanted to continue talking and he answered affirmatively.
Walker ultimately confessed to Detective Everett that he killed Joanne and Quinton Jones. Detective Everett advised Walker that he was facing the death penalty and urged him "man to man, brother to brother, let me help you out," and stated that if Walker told the truth, Everett would inform the assistant state attorney that he had cooperated. Walker confessed that Jones had met him at the movies and they discussed his concerns about paying child support while they drove around, ending up at Sewell Park around 10 or 10:30 p.m. When they arrived at the park, they got out of the car where they argued and fought. Walker stated that Jones slapped him and he choked her and knocked her to the ground where he thought she was unconscious. Walker spotted some duct tape by a fence, taped Ms. Jones' hands, mouth and eyes, and lifted her over the fence into the water in the canal. Walker similarly taped Quinton, who had fallen from Ms. Jones' arms when his parents were fighting, and threw the baby over the fence into the water also. He then drove Ms. Jones' car to Overtown and back up to the 163rd Street mall where he left it and returned home in his own car.
Detective Watterson reentered the room at this point and was apprised of Walker's confession. Watterson testified that he again mentioned that a stenographer was available to record the statement, but Walker reiterated, "I told you before if you do that I don't want to talk." Both Watterson and Everett replied that they would not bring in a stenographer and Everett asked if Walker still wanted to talk. Walker responded affirmatively and Watterson left the room.
Walker then concluded his statement to Detective Everett, explaining that he phoned Jones the following day and left a message on her answering machine to return his call because he did not think she was dead. Although insisting that he had acted alone, Mr. Walker verified that his brother, Quinton Rogers, had been with him that evening, but maintained that his brother had remained in the car while he and the victims went to the park.
Police recovered Ms. Jones' car from the 163rd Street mall and discovered evidence of a struggle inside. The interior of the car was in disarray with cassette tapes, litter, the victim's checkbook and other papers scattered about. The seat covers were torn, the dash board reflected heavy scratching, the radio knobs were broken and on the floor, the ashtray was under the driver's seat, and the lighter was on the rear seat. Blood was found on both seat covers in the car, on the rear portions of the vehicle, on the left rear interior window and door, and on the ceiling.
*305 A strip of duct tape with blood and hair was found under the front passenger seat. Another strip of duct tape containing hair was found under the left rear passenger seat. DNA testing revealed that the blood stains in the interior of the car matched Joanne Jones' DNA type. The DNA from a cigarette filter found in Ms. Jones' ashtray matched the DNA shared by Walker and his brother, Willie Rogers, and 12.2 percent of African-Americans, 6 percent of Caucasians and 4.8 percent of Hispanics.
Vanessa Walker, the defendant's wife, testified that she had observed Walker carrying a bag in the trunk of his car which contained paternity papers and duct tape. During the week prior to the murders, Mrs. Walker saw the defendant carrying a second bag that contained rubber gloves. She had never seen Walker use duct tape or rubber gloves in the three years she had known him. Mrs. Walker also saw the defendant and his brothers whispering together on several occasions during the week of the murders.
On the evening that the murders occurred, Mrs. Walker observed the defendant and his brother, Quinton, who resided with them, leave home at approximately 7:30 p.m. and return together at 12:30 a.m. Upon returning, Walker took a shower and called his mother. Mrs. Walker overheard him tell his mother that he and Quinton had picked up their other brother, Willie, at her house and gone to find his sister, Linda, who had been in a fight with her boyfriend earlier in the day. The following morning, Mrs. Walker saw her husband washing his and his brother's clothing. When Mrs. Walker visited her husband in jail after his arrest, Walker told her that he had not planned the killings someone else had suggested it. He added that two other people were involved and he had only watched.
In response to a complaint lodged by Ms. Jones that Walker had sexually assaulted her, Detective Gary Cunningham of the North Miami Police Department interviewed Walker on July 22, 1991, about a conversation the couple had a few days earlier in which Ms. Jones had told Walker that she was pregnant. Taped excerpts of this interview were played for the jury. Walker told Detective Cunningham that he was willing to pay for Jones to have an abortion and that he told Ms. Jones that "if she insisted to mess up his life or ruin his life, she knew he could make her life miserable." Walker further explained to the detective that Ms. Jones should have an abortion and it would be "the best thing to keep our lives peaceful."
Assistant State Attorney Sylvia Brown testified that she represented Ms. Jones in a child support enforcement action which was filed in April, 1992, a few months after Quinton Jones' birth. The final hearing in the action occurred about two months prior to the murders. Brown stated that during court discussions regarding child support payments, the defendant was not pleased about paying the amount of support ordered by the court. Walker repeatedly told the court he could not afford the $189 biweekly payments. Walker had further objected to amending Quinton's birth certificate to change his son's surname and reflect Walker's paternity.
Dr. Williams, the medical examiner who performed the autopsies on Joanne and Quinton Jones, testified that Ms. Jones suffered a variety of cuts, bruises and swelling on her face and upper body extremities. She also had cuts with bruising and swelling between her eyebrows, under the left eye, and on the left cheek, as well as cuts on the inside of her mouth. The medical examiner explained that the bruising and swelling indicated that these injuries were inflicted while the victim was still alive. Ms. Jones sustained bruising to the back part of her scalp consistent with blunt force trauma, and bleeding and bruising on her interior neck muscles was consistent with manual strangulation. The medical examiner also testified that hemorrhaging found in both of the victim's eyes was consistent with manual strangulation and asphyxiation. Finally, a foamy secretion from Ms. Jones' nose and fluid in her sinuses was consistent with drowning. In the medical examiner's opinion, Ms. Jones died as a result of strangulation, suffocation and drowning. The medical examiner gave a detailed description of the process of drowning, but could not determine whether Ms. Jones was conscious when she entered the *306 water. As to Ms. Jones' seventeen-month-old son, Quinton, the medical examiner noted that no anatomic evidence of drowning had been detected and concluded that Quinton had suffocated to death from the duct tape obstructing his mouth and nose. After a jury trial in February 1994, Walker was found guilty as charged of two counts of first-degree murder, two counts of kidnapping and one count of burglary of a vehicle with an assault or battery.
A penalty phase proceeding was held two and a half months later before the same jury in April, 1994. The State's penalty phase case consisted of brief testimony again from the medical examiner, who reiterated for the jury the process of drowning and how Ms. Jones died from a combination of drowning, smothering and strangulation. He testified that she could have been unconscious when she was thrown into the canal. As to Quinton Jones, Dr. Williams stated that Quinton died from asphyxiation, but could not rule out completely the possibility that Quinton had also drowned.
The State also recalled the defendant's wife, who testified that during their marriage Walker had owned a .357 magnum but she had not seen the gun since the time of his arrest. Ms. Walker admitted on cross examination that the defendant had threatened to shoot himself on one occasion, but she had dissuaded him from doing so.
On his own behalf, Walker called several family members: Betty London, his paternal aunt; Cora Walker, his paternal grandmother; Betty Phinaze, his older cousin who lived with him in his father's household; and Stan Samuels, his cousin and peer. The testimony of these witnesses provided a picture of James Walker's abusive upbringing in a dysfunctional family, as well as his early adult years. In addition, several mental health experts testified about Walker's history of psychological problems, mental illness, organic brain damage and low IQ.
James Walker was an illegitimate child whom his mother abandoned at his father's home when he was about one and a half years old. Betty London and Betty Phinaze both described for the jury the bleak environment in which James was raised in the home of his father and stepmother. Mr. Walker verbally and physically abused Walker throughout his childhood and teenage years, as well as abusing his stepmother. His father often administered the beatings with belts and shoes, and was never affectionate toward his son. If James had not completed his chores when his father got home, he was beaten. James was afraid of his father and did not talk or act normally when his father was present.
James' cousin, Stan Samuels, testified that James had bouts of depression as a child and often would lock himself in his room and stay in bed. As a teenager, Walker began sleeping with a knife under his pillow out of fear. On one occasion, his father beat his stepmother so severely that she had to be hospitalized.
Walker did not learn that his stepmother was not his biological parent until he was about thirteen years old. Around this same time, Walker's stepmother introduced him to alcohol and they would drink together when his father was not home. Shortly before James' father and stepmother separated in his early teen years, he became severely depressed and suffered a nervous breakdown that required medical attention. Ms. Phinaze related that in the ensuing divorce proceedings, James told the judge that he wanted to live with Betty Phinaze, his older cousin who was like a sister to him, rather than either parent.
After the separation, James' paternal grandmother, Cora Walker, came to live in his father's house in Dade County and remained there for three years. Stan Samuels testified that James was sexually molested by a neighborhood handyman during this time, but had confided only in him because of the strong taboo in the Walker family against anything concerning homosexuality.
Cora Walker testified that James' father unexpectedly moved out of the household one day while she and James were attending church because her son believed she had tried to poison him. A few weeks later, James' father returned and took James to live with him in Fort Lauderdale. He forbade James to have any future contact with *307 his family. Cora Walker also related that James served in the military for several years just after high school and, upon receiving an honorable discharge, returned home to find that his father had appropriated all the "allotment checks" James had sent him for safe keeping and refused to allow James to stay in his home in Fort Lauderdale. James moved out on his own and got a job working for a security firm before becoming a bailiff in the court system, a job he held for eight years. However, Stan Samuels testified that James had trouble completing the application and Stan's brother had filled out much of the information for James. Stan also related that James Walker had two brief marriages before having an affair with Ms. Jones and marrying Vanessa Walker.
Walker continued to have bouts of depression as an adult and Judge Barad, for whom Walker worked in 1988, referred Walker to psychologist Dr. Leonard Haber for evaluation. Walker was later referred to a clinical psychologist, Dr. Ronald Bergman, who treated him in twenty-two sessions from August of 1988 until February of 1989, when Walker failed to return for appointments. Dr. Bergman diagnosed him as having a paranoid personality disorder and found Walker to be very sensitive interpersonally, mistrusting of everyoneespecially women and often feeling mistreated and misunderstood. Dr. Bergman stated that Walker experienced internal rage which was barely visible and manifested itself in general agitation.
Psychologist Dr. Jethro Toomer, who also examined Walker at the defense's request, reviewed his mental health history and administered a battery of tests, including the MMPI, the Carlson Psychological Survey and the Bender Gestalt test. Dr. Toomer concluded that Walker suffered from a personality disorder with indications of manic depression and paranoia. Dr. Toomer opined that Walker was under extreme emotional distress at the time of the offense, but could not conclude to a reasonable psychological certainty that he was unable to conform his conduct to the requirements of the law at that time. Nevertheless, Dr. Toomer believed this mitigator was "very likely applicable" to Walker because of his maladapted behavior, paranoid and manic tendencies, bipolar depression and transient thought processes. Dr. Toomer agreed that Walker's mental illness was consistent with a bizarre and unrealistic belief on his part that his actions were morally justified. In addition, Dr. Toomer found indications of organic impairment and referred Walker to Dr. Hyman Eisenstein, a neuropsychologist who tested Walker's IQ, administered the Halstead-Reitan battery to measure brain damage, and also reviewed the MMPI results.
Dr. Eisenstein testified that Walker had an IQ of 76in the borderline rangeand his fourth grade reading level was in the "mild mental retardation" range. Based on the Halstead-Reitan battery, Dr. Eisenstein concluded that Walker had a "profound cognitive decline," eighty-five percent of his scores were consistent with brain impairment, and he was "compromised" in his ability to make rational judgements and decisions. Dr. Eisenstein diagnosed Walker as suffering from a combination of organic brain impairment and borderline personality disorder and opined that, because of the chronic nature of Walker's illness, he was acting under extreme emotional disturbance and unable to conform his conduct to the requirements of the law at the time of the offense. On cross-examination, the prosecutor asked Dr. Eisenstein if Walker might kill again, which prompted immediate objection. The trial court sustained the objection on grounds the question was improper and the question remained unanswered.
The jury returned an advisory recommendation that Walker be sentenced to death on both counts of first-degree murder by a vote of seven to five. The trial court followed the jury's recommendation and sentenced Walker to death for both murders.

APPEAL
Walker raises thirteen claims of error on appeal,[2] and the State raises two issues in a *308 cross-appeal.[3] This Court has expressly rejected Walker's claims of error (8), (9), (11), and (12) in previous cases and we decline to revisit those issues here.[4]
With respect to the State's cross-appeal, we do not believe the trial court abused its discretion in refusing to let attorney Westfield testify for the State. In addition, while we recognize that pecuniary gain and CCP are often appropriately found to be separate aggravators, see Echols v. State, 484 So.2d 568, 575 (Fla.1985), we cannot say that the trial court erred in merging them on the facts of this case.

Admissibility of Abortion Evidence
Walker argues that the evidence concerning his desire that Ms. Jones abort their child was not relevant to showing premeditation or his motive to commit these murders and, even if relevant, it was inadmissible under section 90.403, Florida Statutes (1995), because its weak probative value was outweighed by its unfairly prejudicial effect. As related above, Detective Gary Cunningham of the North Miami Police Department interviewed Walker on July 22, 1991, about a conversation between Mr. Walker and Ms. Jones a few days earlier in which Ms. Jones had told Walker that she was pregnant.
*309 Taped excerpts of this interview were played for the jury in which Walker explained to Detective Cunningham that he was willing to pay for Jones to have an abortion and that he had told Ms. Jones that "if she insisted to mess up his life or ruin his life, she knew he could make her life miserable." Walker also told the detective that Ms. Jones should have an abortion and it would be "the best thing to keep our lives peaceful." The prosecutor argued to the jury in closing that this evidence showed Walker had a motive to murder Joanne and Quinton Jones:
Because already, on the very first day of July the 20th, when she told that man that she was carrying his child, he didn't want that baby. I don't know if you understand. But I mean he didn't want that baby. He said, Get an abortion. I'll pay for it. This is what's on tape[defense objection overruled] what's on the tape you're welcome to listen to.... He didn't want to assume responsibility. And as adults we know that if we decide to engage in sexual relations we take a chancewe take the chance the woman could get pregnant. And if she exercises her god-given and her constitutional right-and yes she had a constitutional right tooto carry that child to birth, both parents share responsibility for that poor, innocent child, okay?
He had no difficulty in understanding simple math. We know that. Pay for an abortion now, it might be three or $500, or pay for the next 18 years of that child's life. He said to the victim, and he admitted this to Detective Cunningham, If you ruin my life, I'll make your life miserable too. Or I can do that. That's what he said. And he went on to say an abortion would keep their lives peaceful.
We begin our analysis with the well-settled rule that relevant evidence is evidence which tends "to prove or disprove a material fact," § 90.401, Fla. Stat. (1995), and all relevant evidence is generally admissible unless the law provides otherwise. Id. § 90.402. We agree with the State that the evidence Walker challenges here is part of a long chain of events taking place over a two-year period leading up to the murders which is admissible for the purpose of establishing Walker's motive and intent to kill Ms. Jones and their son, Quinton. In 1991, Walker was initially dissatisfied with Ms. Jones' decision to have the baby, which he wanted her to abort. In April, 1992, shortly after the baby was born, the paternity/child support proceedings commenced and testimony from the prosecutor handling the case showed that Walker was not happy about taking financial responsibility for the child or recognizing his paternity. A few weeks subsequent to the support order becoming final, Walker murdered his son and ex-girlfriend after arguing with her about the support award.
As to Walker's alternative claim that, although relevant, the admission of this evidence was unfairly prejudicial to him, section 90.403, Florida Statutes (1995), reads:
Relevant evidence is inadmissible if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of issues, misleading the jury, or needless presentation of cumulative evidence. This section shall not be construed to mean that evidence of the existence of available third-party benefits is inadmissible.
We explained the balancing test which a trial court must perform under section 90.403 in State v. McClain, 525 So.2d 420 (Fla.1988):
This statute compels the trial court to weigh the danger of unfair prejudice against the probative value. In applying the balancing test, the trial court necessarily exercises its discretion. Indeed, the same item of evidence may be admissible in one case and not in another, depending upon the relation of that item to the other evidence. E. Cleary, McCormick on Evidence, § 185 (3d ed. 1984).
Professor Ehrhardt explains the application of the statute as follows:
Although Section 90.403 is mandatory in its exclusion of this evidence, a large measure of discretion rests in the trial judge to determine whether the probative value of the evidence is substantially outweighed by any of the enumerated reasons. The court must weigh the proffered evidence against the other facts in the record and balance it against the strength of the reason for exclusion.

*310 In excluding certain relevant evidence, Section 90.403 recognizes Florida law. Certainly, most evidence that is admitted will be prejudicial to the party against whom it is offered. Section 90.403 does not bar this evidence; it is directed at evidence which inflames the jury or appeals improperly to the jury's emotions. Only when that unfair prejudice substantially outweighs the probative value of the evidence is the evidence excluded.
....
In weighing the probative value against the unfair prejudice, it is proper for the court to consider the need for the evidence; the tendency of the evidence to suggest an improper basis to the jury for resolving the matter, e.g., an emotional basis; the chain of inference necessary to establish the material fact; and the effectiveness of a limiting instruction.
Id. at 422 (quoting Charles W. Ehrhardt, Florida Evidence § 403.1 at 100-03 (1984 ed.)).
Applying these principles to the instant case, it is clear that Walker's statements to Detective Cunningham constituted a significant piece of evidence to demonstrate material facts at issue here, i.e., that Walker had a motive to murder the victims and that unlike some "domestic" disputes, these murders were planned and premeditatedas opposed to resulting from an emotional outburst. Although evidence of this type may have a tendency to raise emotional responses relating to the morality of abortion in general, the presentation of the evidence and closing argument to the jury in this case reflect that the prosecutor used this evidence solely to establish the long chain of events leading up to the murders shortly after Walker was obligated to make child support payments.
Contrary to Walker's suggestion, the prosecutor did not use this evidence to needlessly inflame the jury or provide an improper basis for their verdict. Consequently, we reject Walker's claim and find that the trial court did not abuse its discretion in performing the section 90.403 balancing test and admitting Walker's statements to Detective Cunningham as relevant evidence against him.

Admissibility of Walker's Statements
Walker contends that his right to counsel under article I, section 9 of the Florida Constitution was violated during his interrogation at Metro-Dade police headquarters when he equivocally indicated to the interrogating officers his desire to have a lawyer present. Walker maintains that because the officers failed to stop the interrogation and clarify his request, the trial court erred in denying his motion to suppress his confession and allowing the interrogating officers to testify as to the substance of his statements at trial.
In State v. Owen, 696 So.2d 715 (Fla. 1997), this Court recently followed the lead of the United States Supreme Court in Davis v. United States, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), in holding that "police in Florida need not ask clarifying questions if a defendant who has received proper Miranda warnings makes only an equivocal or ambiguous request to terminate an interrogation after having validly waived his or her Miranda rights." We receded from prior decisions which had held that an equivocal invocation of Miranda rights required the police to either terminate interrogation or clarify the suspect's wishes.
In this case, Walker voluntarily drove himself to Metro-Dade headquarters to be questioned about the murders of Joanne and Quentin Jones. Walker was read his Miranda rights and signed a waiver form while talking with the officers in an interview room.
Initially, Walker contends that the police should have ceased their interrogation of him when he stated, on two occasions, that if police brought in a stenographer to record his statement he wanted an attorney. These comments did not constitute a clear request for an attorney. His request for counsel was conditioned upon the possibility that the officers would not honor his wish and insist on recording his statement anyway. When the officers told Walker that his statement would not be recorded, Walker continued to talk and did not reassert a desire to have an *311 attorney present. Moreover, Detective Everett explicitly testified at the suppression hearing that in response to Walker's request not to have his statement recorded, he asked Walker if he wanted to continue talking and Walker answered affirmatively. The trial court did not err in denying Walker's motion to suppress.
Walker next contends that the coercive interrogation techniques employed by Detectives Everett and Watterson rendered his confession involuntary. Where a defendant alleges that his statement was the product of coercion, the voluntariness of the confession must be "determined by an examination of the totality of the circumstances." Traylor v. State, 596 So.2d 957, 964 (Fla. 1992).
In this case, Walker cites as improper the combination of the following techniques: (1) Walker was not advised prior to interrogation that he was the "focus" of the investigation; (2) police falsely told Walker that they had found "a" fingerprint or "his" fingerprint on the duct tape from one of the victims before they had learned of such results, and repeatedly insisted that they knew he was guilty; (3) police showed Walker a picture of the deceased infant's decomposing body and told him that whoever had done this had done a terrible thing; (4) knowing that Walker was a deacon in his church, police exploited his religious beliefs when they told him that God would not believe his "abduction" story; (5) police engaged in "racially-charged role playing" with Detective Watterson, a white officer, being the "bad-cop" while Detective Everett, a black officer, attempted to relate to Walker "brother to brother." (6) police threatened Walker with the "electric chair" and Detective Everett then promised he could help Walker out.
In orally denying Walker's motion on these grounds, the trial court noted:
And these techniques that were used by the police, everyone knows about them. They have not been disapproved by the law in any way. They are used constantly. They practically are used in every murder case I've ever heard about. And I think there's no question that given the totality of circumstances, that this statement that the Defendant gave was freely and voluntarily given and the motion to suppress is denied.
As noted previously, a trial court's ruling on a motion to suppress is accorded great deference. McNamara v. State, 357 So.2d 410 (Fla.1978). The testimony from the motion to suppress hearing reflects that the trial court's denial of Walker's motion on this ground also is supported by the record.
Contrary to Walker's assertions, the police interrogation here simply cannot be characterized as so coercive as to render his confession involuntary. Although Walker was questioned for six hours, the interrogation occurred during the morning and early part of day. Walker was provided with drinks upon request and allowed to use the bathroom when he wished. Although Detective Everett reminded Walker that he could face the death penalty for the murders of the victims in this case, Walker was never threatened with the "electric chair," or promised anything other than that Detective Everett would inform the prosecutor that Walker had cooperated in the investigation. Although Detective Watterson did not know that Walker's fingerprint was found on a piece of duct tape when he conveyed that information to Walker during questioning, Watterson honored appellant's wishes and refrained from taking fingerprints or photographs at that time because of Walker's shaken reaction to that news.[5] Consequently, we affirm the trial court's denial of Walker's motion on this ground also.
*312 Finally, Walker contends that his confession was improperly admitted against him because it was the product of an illegal arrest for which the officers lacked probable cause. Probable cause for arrest exists where an officer "has reasonable grounds to believe that the suspect has committed a felony. The standard of conclusiveness and probability is less than that required to support a conviction." Blanco v. State, 452 So.2d 520, 523 (Fla.1984). The question of probable cause is viewed from the perspective of a police officer with specialized training and takes into account the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Schmitt v. State, 563 So.2d 1095, 1098 (Fla. 4th DCA 1990).
Specifically, Walker characterizes the totality of the officers' knowledge at the time of the arrest as follows: (1) Walker's inconsistent statements to police regarding his activities on the night of the murders; (2) his nervous reaction when police falsely reported that a fingerprint had been found on the duct tape; (3) his unique knowledge of the location of the duct tape on Ms. Jones' body; and (4) unverified information from the victims' family members that Walker was having some "difficulties" in his relationship with Ms. Jones. Walker argues that such knowledge was insufficient to establish probable cause for his arrest.
However, in addition to the information cited by appellant, the record reflects that at the time of Walker's arrest, the officers also (1) knew that Walker had repeatedly lied to police, first maintaining that he had not been with the victims on the night they were murdered and later offering the "abduction" story in which he could not explain how he had gotten home after being abandoned near the Orange Bowl by the armed men or why he had not informed police that his son and former girlfriend had been bound and abducted; and (2) were aware that Walker had a motive for the murder in that he and Ms. Jones were having disagreements about child support payments and that Ms. Jones had filed a complaint accusing Walker of sexually assaulting her on a prior occasion. In light of the totality of these circumstances, we do not find that the trial court erred in rejecting Walker's claim that police lacked probable cause to arrest him during his interrogation and affirm the denial of Walker's motion to suppress.

Effectiveness of Curative Instruction
As his third claim of error, Walker asserts that the trial court erred in denying his motion for mistrial immediately after Detective Watterson, in the course of his testimony as a prosecution witness at trial, referred to Walker's purported commission of an uncharged offense against Ms. Jones. Detective Watterson was called as a prosecution witness at trial, and during his narrative testimony concerning the substance of the police officers' interrogation of Walker, Detective Watterson related to the jury that he had not believed Walker's "abduction" story and told the defendant "that we had serious problems with the story that he was telling us; that I was aware of the fact that he had a sexual assault charge filed against him." The trial court immediately sustained Walker's objection to the testimony, finding there was "no question that the prejudicial value far outweighs any probative value."
Nevertheless, the trial court denied Walker's motion for a mistrial and, over Walker's objection that it was inadequate, gave the jury the following curative instruction:
Members of the jury, I want to give you a special instruction with respect to a statement that was made by this witness. First, is this: No chargesno charges were ever brought against Mr. Walker for sexual battery. And, number two, you are not to believe or assume that Mr. Walker committed any sexual battery. Disregard that last statement.
Contrary to Walker's position, the State contends that Detective Watterson's statement during his testimony was admissible and the trial court erred in sustaining Walker's objection and instructing the jury. On appeal, we need not address whether, as the State asserts, Detective Watterson's testimony was admissible as relevant evidence further establishing that Walker and Ms. Jones had a hostile relationship and that Walker had a motive to murder her. Rather, we *313 address only whether the error that occurred when the jury heard this testimony was a harmless one in light of the trial court's curative instruction.
In Geralds v. State, 601 So.2d 1157, 1161-62 (Fla.1992), which Walker cites as mandating a new trial here, this Court found a curative instruction ineffective where the improperly elicited testimony established that the defendant had eight prior convictions and the prosecutor subsequently argued that the defendant was a "career felon." Unlike Geralds, Detective Watterson's improper testimony here, which the State did not elicit, was an isolated remark which the trial court quickly and effectively cured with an explicit instruction that the jury disregard the comment. Consequently, we reject Walker's claim that a mistrial was warranted and find the error harmless in light of the trial court's explicit curative instruction.

Admissibility of Expert Testimony on DNA Test Results
As his last claim of error regarding the guilt phase of his trial, Walker contends that the trial court abused its discretion in denying Walker's motion to suppress expert testimony concerning DNA tests on a cigarette butt found in Ms. Jones' car because the evidence was not relevant to any fact at issue in the case. Dr. Kahn, of the Metro-Dade crime lab's DNA section, testified at trial that he performed PCR testing on a cigarette filter found in Ms. Jones car. He found the DNA from the filter to be type 1.1, 1.2a type shared by Walker, his brother Willie Rogers, and 12.2 percent of the African-American population, 6 percent of the Caucasian population, and 4.8 percent of the Hispanic population.
Specifically, Walker argues that this evidence was erroneously admitted at trial because the test results are not probative, by themselves, of the presence in Ms. Jones' car of either Walker or his brother. Moreover, Walker does not smoke, and the state failed to present any evidence that Rogers smoked either. As the State correctly points out, similar challenges to blood test evidence establishing that a general blood type is shared by both the litigant and the tested item have been rejected. See Mann v. State, 420 So.2d 578, 580 (Fla.1982); Williams v. State, 143 Fla. 826, 833-834, 197 So. 562 (1940) (holding that blood-grouping evidence was admissible where the respective blood types of the defendant and victim could be identified only as types 2 and 4). See generally Timothy E. Travers, Annotation, Admissibility, weight, and sufficiency of blood-grouping tests in criminal cases, 2 A.L.R.4th 500 (1980). We find that the concerns Walker raises in this claim go to the weight of the DNA evidencewhich Walker had an opportunity to argue was lowand not to its admissibility.[6] Consequently, we do not find that the trial court abused is discretion in denying Walker's motion to suppress Dr. Kahn's expert testimony.

Future Dangerousness and Parole Ineligibility[7]
As his first penalty phase claim of error, Walker maintains that a new sentencing trial is warranted because the prosecutor improperly interjected "future dangerousness" as an nonstatutory aggravating circumstance into the proceedings. In the course of questioning Dr. Eisenstein about his opinion that Walker could not conform his conduct to the requirements of the law at the time of the offense, the prosecutor *314 asked: "Well, do you think also that [Walker] may kill again?"[8]
This Court has explained that "the probability of recurring violent acts by the defendant if he is released on parole in the distant future" is not a proper aggravating circumstance in Florida. Miller v. State, 373 So.2d 882, 886 (Fla.1979); White v. State, 403 So.2d 331, 337 (Fla.1981). Moreover, the State may not attach aggravating labels to factors that actually should militate in favor of a lesser penaltylike, as in this case, the defendant's mental impairment. Zant v. Stephens, 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235 (1983).
We agree with Walker that the prosecutor's question was wholly improper and in no way related to probing Dr. Eisenstein's opinion that Walker's ability to conform his conduct to the requirements of the law was substantially impaired at the time of the offense. A review of the record further reflects that any prejudice resulting from the question was not dissipated by the fact that Walker's immediate objection was sustained and the expert did not answer the question. In other words, the "bell was rung" by the question itself; and was not "unrung" by the fact that the question was not answered. Nevertheless, we note that the prosecutor neither repeated or rephrased the improper question, nor argued to the jury in closing that Walker would or might kill again. While the prosecutor's question to Dr. Eisenstein clearly was improper, this instance of misconduct was an isolated one. Moreover, the trial court properly instructed the jurors as to the aggravating factors they could consider. Consequently, we find no reasonable possibility that this error contributed to the jury's recommendation and conclude that it was harmless beyond a reasonable doubt. State v. DiGuilio, 491 So.2d 1129 (Fla.1986).
Walker makes the further argument that the unfair prejudice to him resulting from the improper questioning of Dr. Eisenstein is compounded by the trial court's error in rejecting his request to determine prior to the penalty phase trial whether Walker's sentences for capital murder would be consecutive or concurrent, as well as the sentences for Walker's noncapital convictions so that the jury could be apprised and instructed accurately on Walker's parole ineligibility.[9] In his penalty phase closing argument, Walker argued to the jury that he could receive consecutive life sentences that would preclude him from ever being released from prison during his natural life.
Our caselaw is adverse to Walker's position. In Nixon v. State, 572 So.2d 1336 (Fla.1990), we construed Florida Rule of Criminal Procedure 3.390(a) to prohibit instructions regarding the possible penalties a capital defendant could receive for his contemporaneous felony convictions, adding, "[a]s to offenses in which the jury plays no role in sentencing, the jury will not be advised of the possible penalties." Id. at 1345. Florida's sentencing scheme simply does not require the trial court to sentence the defendant for noncapital convictions before the penalty phase proceedings. Moreover, Walker's request that the trial court determine whether it would sentence him to consecutive or concurrent life sentences for the murders is inconsistent with Florida's jury *315 override provision. See § 921.141(3), Florida Statutes (1995). In any event, a pre-penalty phase determination of the defendant's sentence for the capital offenses should the jury return verdicts of life would be premature given that the trial court would not have available for its consideration the facts and circumstances surrounding the offenses and the defendant's life historyinformation adduced at the penalty phase proceeding.
We conclude that Walker was afforded what Florida and U.S. Supreme Court caselaw deem sufficient, i.e., the opportunity to argue to the jury potential parole ineligibility as a mitigating factor.[10] Consequently, we find that the trial court's denial of all aspects of Walker's claim was an appropriate exercise of its discretion. See Turner v. Dugger, 614 So.2d 1075, 1080 (Fla.1992); Jones v. State, 569 So.2d 1234, 1239-40 (Fla.1990).[11]
Walker next contends that the trial court erred in allowing the medical examiner to testify about the panic and struggle inherent in death by drowning as support for the heinous, atrocious or cruel (HAC) aggravating factor in this case because the State failed to prove that Ms. Jones was conscious when she was thrown into the canal. Here Walker explained in his statement to police that he physically fought with Ms. Jones, choked her, knocked her down, bound her with duct tape, and threw her over the fence into the canal in Sewell Park. We find that Walker's statement, together with Dr. Williams' testimony that drowning was a cause of death and that Ms. Jones was alive when she was thrown into the water, is sufficient to establish beyond a reasonable doubt that she was conscious. Consequently, Dr. Williams' testimony was admissible under sections 90.401 and 90.403 as relevant and probative of the struggle and panic Ms. Jones likely experienced after being thrown into the canal.
We note also that the HAC aggravator is amply supported by the record in this case independent of Ms. Jones' consciousness when she was thrown into the canal. We have stated that the fear and emotional strain preceding the death of the victim may be considered as contributing to the heinous nature of a capital felony. Adams v. State, 412 So.2d 850, 857 (Fla.1982). The record reflects that Ms. Jones struggled against appellant for some time before her death as there were blood stains all over the interior of her car, strips of duct tape containing her blood and hair were found inside, the car was in complete disarray, and Ms. Jones sustained numerous abrasions and contusions all over her body. Moreover, Ms. Jones undoubtedly contemplated before her death that her infant son also faced great danger and potential harm.

Improper Argument
As his next claim of error, Walker argues that the prosecutor's remarks during the penalty phase closing argument impugning defense counsel and characterizing the expert witnesses as "hired guns," as well as asking the jury to put themselves in the victims' shoes and imagine their suffering, were so prejudicial and inflammatory that a new sentencing trial is required. This Court has held that prosecutorial misconduct in the penalty phase must be egregious to warrant vacating the sentence and remanding for a new penalty phase proceeding. Garron v. State, 528 So.2d 353 (Fla.1988). The prosecutor's remarks in this case impugning the defense and later urging the jury to imagine the victim's pain and suffering were improper under Florida caselaw. See, e.g., Garron, 528 So.2d at 358-59 & n. 6 (Fla.1988) (stating *316 that "golden rule" arguments which inject emotion and fear into jury deliberations are outside scope of proper argument); Redish v. State, 525 So.2d 928, 931 (Fla. 1st DCA 1988) (finding verbal attacks on personal integrity of opposing counsel inconsistent with prosecutor's role). However, the prosecutor's comments concerning defense counsel came only at the end of a legitimate argument questioning the credibility of the experts' opinions and their use of mental health data, and the prosecutor heeded the trial court's admonition to "clear it up." Likewise, we recognize that argument to the jury that they "imagine" the suffering of the victims reflects a poor choice of words by the prosecutor in his effort to emphasize the painful ordeal that Joanne and Quinton Jones must have endured in this case. Consequently, we find that these discrete instances of misconduct are harmless beyond a reasonable doubt and do not warrant a new sentencing trial. See Bertolotti v. State, 476 So.2d 130, 133 (Fla. 1985) (finding that although prosecutor's comments exceeded proper bounds of argument, misconduct not so outrageous as to taint validity of jury's recommendation).

Jury Instructions
Next, Walker asserts the following six infirmities regarding the trial court's instructions on aggravators: (1) refusing to give Walker's requested HAC instruction and instead giving the standard instruction which was vague and relieved the state of its burden of proof; (2) refusing to give an expanded CCP instruction where the Jackson instruction was insufficient to cure the constitutional infirmity in the statute and standard instruction; (3) refusing to give Walker's requested pecuniary gain instruction and instead giving the standard instruction; (4) refusing to instruct the jury on the circumstantial evidence and burden of proof standards for aggravators; (5) refusing to instruct the jury not to consider nonstatutory aggravators; and (6) improperly instructing the jury on the prior violent felony and felony-murder aggravators. We reject each of Walker's claims.
As to the HAC instruction, the standard instruction given in this case is the same instruction this Court approved in Hall v. State, 614 So.2d 473, 478 (Fla.1993), and found sufficient to overcome vagueness challenges to both the instruction and the aggravator. Id. As to the CCP instruction, the instruction given here is the same instruction this Court directed trial courts to use in Jackson v. State, 648 So.2d 85 (Fla.1994), while a new standard instruction was developed and adopted. The standard CCP instruction ultimately approved in December of 1995 contains the same definition of "cold" as the instruction given in this case. See Standard Jury Instructions in Criminal Cases, 665 So.2d 212 (Fla.1995). As to the pecuniary gain aggravator and instruction, this Court stated in Chaky v. State, 651 So.2d 1169 (Fla.1995), that the pecuniary gain aggravator applies where "the murder is an integral step in obtaining some sought-after specific gain." Id. at 1172. We further explained the applicability of this aggravator in Finney v. State, 660 So.2d 674 (Fla.1995), stating that "[i]n order to establish this aggravating factor, the State must prove beyond a reasonable doubt that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain." Id. at 680. Thus, the standard instruction which the jury received in this case was appropriate in light of the evidence showing that Walker did not want to take responsibility for Quinton Jones, asked Joanne Jones to get the support payments reduced, and killed both victims after arguing with Ms. Jones about child support.
As to Walker's requested instruction that an aggravating circumstance cannot be inferred from circumstantial evidence unless it is inconsistent with every reasonable hypothesis of innocence, this Court stated in Pietri v. State, 644 So.2d 1347 (Fla.1994), that a circumstantial evidence instruction is not required at the guilt phase where the jury is otherwise instructed on reasonable doubt and burden of proof. Id. at 1353 n. 9. Similarly, the jury in this case was properly instructed that each aggravator must be established beyond a reasonable doubt before it can be considered. As to Walker's request that the trial court instruct the jury not to consider nonstatutory aggravating circumstances, *317 such an instruction is not required where, as here, the jury was properly instructed that "the aggravating circumstances that you may consider are limited to any of the following that are established by the evidence."
Finally, the trial court's instructions on the prior violent felony and felony-murder aggravator were not duplicative. This Court has held that the prior violent felony aggravator may be found where, as here, there are contemporaneous convictions for crimes against multiple victims. Windom v. State, 656 So.2d 432 (Fla.1995). Moreover, the trial court specifically stated in its sentencing order that this aggravator was based solely on Walker's contemporaneous convictions for the murders of the two victims. Likewise, the felony-murder instruction was not duplicative as it rested on Walker's other, noncapital offenses for kidnapping and burglary.

Sentencing Order and Proportionality
For his last claim of error, Walker contends that his death sentence is disproportionate because the trial court erred in finding the heinous, atrocious or cruel; cold, calculated and premeditated; and pecuniary gain aggravators and also improperly failed to consider certain statutory and nonstatutory mitigators established by the evidence.
As noted previously, the trial court's finding that the HAC aggravator existed here is supported by the record and this factor has been established regardless of whether Ms. Jones was conscious when she was thrown into the canal. Adams, 412 So.2d at 857 (fear and emotional strain preceding victim's death may be considered as contributing to heinous nature of capital felony); see also Tompkins v. State, 502 So.2d 415, 421 (Fla. 1986) (factor of heinousness is applicable where method of killing is strangulation). As to the CCP aggravator, the trial court's finding that "the defendant carefully, calmly and with reflection, planned to lure Joanne Jones to a place where she could be abducted, enlisted the assistance of his brothers to kill her, and then proceeded according to plan," is supported by the record and consistent with other cases where we have approved this aggravator. See Cruse v. State, 588 So.2d 983 (Fla.1991) (advance procurement of weapon and ample time for reflection supported CCP notwithstanding contemporaneous finding that defendant acted under extreme mental or emotional disturbance); Koon v. State, 513 So.2d 1253 (Fla.1987) (luring victim from home and advance procurement of murder weapon supported CCP).
With respect to the pecuniary gain aggravator, Walker argues that the evidence was insufficient to submit this aggravator to the jury and further failed to preclude the reasonable hypothesis that this "domestic" murder was motivated by anger rather than financial gain. We have stated that this aggravating factor is established where the State proves beyond a reasonable doubt "that the murder was motivated, at least in part, by a desire to obtain money, property, or other financial gain." Finney v. State, 660 So.2d 674, 680 (Fla.1995), cert. denied, 516 U.S. 1096, 116 S.Ct. 823, 133 L.Ed.2d 766 (1996); see also Allen v. State, 662 So.2d 323 (Fla.1995), cert. denied, 517 U.S. 1107, 116 S.Ct. 1326, 134 L.Ed.2d 477 (1996). In this case, Walker encouraged Ms. Jones to have an abortion when he learned about the pregnancy, later stating that he could "make her life miserable" in the event she chose to have the baby. Shortly after Quinton's birth, Ms. Jones asked Walker to contribute to the child's support. When he refused she sought a court order award of support. Within weeks of the final order awarding support, Walker murdered Ms. Jones and his infant son. In his confession, Walker stated that he and Ms. Jones were arguing about the child support award in Sewell Park before he killed her. We find that the defendant's pecuniary motive in avoiding child support permeates this case and this aggravating factor is established beyond a reasonable doubt.
Regarding mitigating circumstances, Walker claims that the trial court's finding that the no criminal history mitigator "has been proven by clear and convincing evidence" indicates that the trial court applied too stringent a standard of proof when considering all possible mitigators. We previously *318 rejected this claim in Henry v. State, 613 So.2d 429, 432-33 (Fla.1992). In this case, the trial court properly instructed the jury on the standard of proof for mitigators and the language about which Walker complains does not establish that the trial court failed to follow those instructions.
Walker next argues that the trial court improperly rejected the substantial impairment statutory mitigator, § 921.141(6)(f), where Dr. Eisenstein's expert opinion that it existed was supported by psychological data and the defendant's life history. The trial court rejected the opinion testimony of Dr. Eisenstein concerning the existence of this mental mitigator because Walker's "conduct demonstrates rather than negates an ability to understand the criminality of [his] actions." In addition, contrary to Walker's assertions, the expert testimony was rebutted by the State, and Walker's other mental health expert, Dr. Toomer, could not say with certainty that this statutory mitigator existed. Consequently, we find that the trial court acted within its discretion in rejecting this statutory mitigator. See Johnson, 660 So.2d at 646-47 (contradictory evidence regarding mitigating factor supports trial court's conclusion that factor does not exist); Walls, 641 So.2d at 390-91 (stating that "debatable link between fact and opinion relevant to a mitigating factor, usually means, at most, that a question exists for judge and jury to resolve").
As to the nonstatutory mitigator of Walker's abusive childhood, however, we agree with Walker that the trial court erred in rejecting this factor and giving it no weight in the sentencing process. The trial court acknowledged that the evidence supported the existence of this mitigator but then improperly rejected it because Walker had demonstrated good behavior in his adult life. This Court has repeatedly acknowledged that evidence of abuse of the defendant is mitigating in nature. See Elledge v. State, 613 So.2d 434, 436 (Fla.1993); Clark v. State, 609 So.2d 513, 516 (Fla.1992). Moreover, we have expressly rejected the rationale upon which the trial court in the instant case dismissed this mitigator. See Nibert v. State, 574 So.2d 1059, 1062 (Fla.1990) ("The fact that a defendant had suffered through more than a decade of psychological and physical abuse during the defendant's formative childhood and adolescent years is in no way diminished by the fact that the abuse finally came to an end."). In addition, we find that the trial court failed to consider numerous nonstatutory "positive" mitigators that Walker was honorably discharged from the military; was gainfully employed; had family members who testified to his good qualities; and was a deacon in his church.[12] Contrary to the State's assertion that Walker failed to apprise the trial court of these nonstatutory mitigators in a reasonable manner, we find that Walker adequately addressed these various factors in his sentencing memorandum and in his motion for requested instructions on nonstatutory mitigators, which was expressly incorporated by reference in the sentencing memorandum to the court.
This Court has repeatedly held that all mitigating evidence, found anywhere in the record, must be considered and weighed by the trial court in its determination of whether to impose a sentence of death. See Robinson v. State, 684 So.2d 175 (Fla.1996); Farr v. State, 621 So.2d 1368 (Fla.1993); Santos v. State, 591 So.2d 160 (Fla.1991); Campbell v. State, 571 So.2d 415 (Fla.1990); Rogers v. State, 511 So.2d 526 (Fla.1987). We have just recently underscored this requirement in Reese v. State, 694 So.2d 678 (Fla.1997), wherein we remanded for a new sentencing under circumstances almost identical to those involved herein. The policy rationale behind our holdings is very simple yet powerful:

*319 While all judicial proceedings require fair and deliberate consideration by a trial judge, this is particularly important in a capital case because, as we have said, death is different.

Crump v. State, 654 So.2d 545, 547 (Fla.1995) (citing State v. Dixon, 283 So.2d 1, 17 (Fla. 1973)) (emphasis added). Since the ultimate penalty of death cannot be remedied if erroneously imposed, trial courts have the undelegable duty and solemn obligation to not only consider any and all mitigating evidence, but also to "expressly evaluate in [their] written order[s] each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence." Campbell, 571 So.2d at 419; Ferrell v. State, 653 So.2d 367, 371 (Fla.1995) (reaffirming Campbell and establishing enumerated requirements for treatment of mitigating evidence).
This bedrock requirement cannot be met by treating mitigating evidence as an academic exercise which may be summarily addressed and disposed of. To satisfy Campbell:
This evaluation must determine if the statutory mitigating circumstance is supported by the evidence and if the non-statutory mitigating circumstance is truly of a mitigating nature. A mitigator is supported by evidence if it is mitigating in nature and reasonably established by the greater weight of the evidence. Once established, the mitigator is weighed against any aggravating circumstances. It is within the sentencing judge's discretion to determine the relative weight given to each established mitigator; however, some weight must be given to all established mitigators. The result of this weighing process must be detailed in the written sentencing order and supported by sufficient competent evidence in the record. The absence of any of the enumerated requirements deprives this Court of the opportunity for meaningful review.

Ferrell, 653 So.2d at 371 (emphasis added). Clearly then, the "result of this weighing process" can only satisfy Campbell and its progeny if it truly comprises a thoughtful and comprehensive analysis of any evidence that mitigates against the imposition of the death penalty. We do not use the word "process" lightly. If the trial court does not conduct such a deliberate inquiry and then document its findings and conclusions, this Court cannot be assured that it properly considered all mitigating evidence. In such a situation, we are precluded from meaningfully reviewing the sentencing order. Id. Since that is precisely the case here, we must vacate the sentence of death and remand for a proper evaluation and weighing of all nonstatutory mitigating evidence as required by Campbell, Ferrell, Robinson, and Reese.
Accordingly, we affirm Walker's convictions and his sentences for the noncapital felony offenses, but remand this case for a careful and proper reconsideration by the trial court to be completed within 120 days as to the sentences for capital felonies where Walker's abusive upbringinga significant mitigating factoras well as the other "positive" nonstatutory mitigators described above are accorded appropriate consideration and weight in the trial court's sentencing process.
It is so ordered.
OVERTON, SHAW, GRIMES, HARDING and ANSTEAD, JJ., concur.
WELLS, J., concurs in part and dissents in part with an opinion.
WELLS, Judge, concurring in part and dissenting in part.
I fully concur with the majority's decision affirming Walker's conviction.
I dissent from the majority's remand of this case for reconsideration by the trial court. The trial court's order shows that the court considered the evidence of the defendant's childhood but found that it was entitled to no weight. The trial court then wrote: "The mitigating circumstances, both statutory and non-statutory were separately considered, and accorded appropriate weight." This statement sufficiently shows that the trial court followed the dictates of Campbell v. State, 571 So.2d 415, 419 (Fla. 1990). See Barwick v. State, 660 So.2d 685, 695-96 (Fla.1995), cert. denied, 516 U.S. 1097, *320 116 S.Ct. 823, 133 L.Ed.2d 766 (1996). I would affirm the death sentence.
NOTES
[1] The manner in which Ms. Jones had been bound and the location of the duct tape on her body had not been disclosed to the public in the press releases; and Walker had not been informed that she had been bound around the mouth and eyes before making this statement to police.
[2] The claims are: (1) the trial court abused its discretion in permitting the state to introduce evidence that Walker had asked the victim, Ms. Jones, to have an abortion after learning she was pregnant with his son in order to establish, in part, Walker's motive and intent for the murders; (2) the trial court erred in denying Walker's motion to suppress statements that he made to police three days after the murders occurred; (3) the trial court erred in denying Walker's motion for a mistrial after Detective Watterson referred to Walker's purported commission of an uncharged crime against Ms. Jones during his testimony as a State witness; (4) the trial court erred in allowing the state's expert witness to testify about the results of DNA tests on a cigarette butt found in the victim's car; (5) Walker was denied a fundamentally fair and reliable sentencing proceeding where the trial court first failed to grant a mistrial after the prosecutor improperly interjected Walker's" future dangerousness" into the proceedings and refused thereafter to instruct the jury on Walker's parole ineligibility; (6) the trial court abused its discretion in allowing the medical examiner to testify at the guilt and penalty phases about the graphic nature of death by drowning where the victim was likely unconscious when she was thrown into the canal; (7) the prosecutor's improper disparagement of defense counsel and prohibited "golden rule" arguments during the penalty phase closing argument requires reversal of Walker's death sentences; (8) the trial court erred in refusing to give Walker's requested instructions on mitigating circumstances; (9) the trial court erred in refusing to modify the standard jury instructions as to the state's burden of proving beyond a reasonable doubt that death is the appropriate punishment; (10) the trial court erred in refusing to give Walker's requested jury instructions regarding aggravating circumstances; (11) the jury was misled as to the significance of its advisory verdict in violation of Caldwell v. Mississippi;. (12) Florida's death penalty statute is unconstitutional; (13) Walker's death sentences are disproportionate because the trial court improperly found the heinous, atrocious, or cruel (HAC), cold, calculated, and premeditated (CCP), and pecuniary gain aggravators and erroneously failed to find and consider statutory and nonstatutory mitigators established by the evidence.
[3] The state asserts on cross-appeal that the trial court erred by (1) precluding the testimony of a Miami attorney, Don Westfield, which was relevant to establish certain aggravators and negate mitigators and, (2) merging the pecuniary gain and CCP aggravators.
[4] As to claim (8), see generally Walls v. State, 641 So.2d 381, 389 (Fla.1994) (finding no error in failing to give more detailed instructions on mitigation where the "instruction on mitigating factors has been repeatedly upheld both in this Court and in the federal courts, and we reaffirm its validity today"); see also Johnson v. State, 660 So.2d 637, 642 (Fla.1995) (rejecting claims identical to Walker's that the words "extreme" and "substantially" should be deleted from the standard instructions and that the "catch-all" instruction is ambiguous, as well as his requested instruction on the weighing process), cert. denied, 517 U.S. 1159, 116 S.Ct. 1550, 134 L.Ed.2d 653 (1996); Gamble v. State, 659 So.2d 242, 246 (Fla.1995) (finding that specific instruction as to nonstatutory mental impairment mitigation which fell short of statutory mitigator was not required); Armstrong v. State, 642 So.2d 730, 734 n. 2 (Fla.1994) (stating that penalty phase claim alleging error in failing to instruct that mitigating evidence need not be found unanimously was among the numerous claims rejected by this Court). As to claim (9), see Johnson, 660 So.2d at 647; Wuornos v. State, 644 So.2d 1012, 1020 at n. 5 (Fla.1994); Preston v. State, 531 So.2d 154, 160 (Fla.1988). As to claim (11), see Johnson, 660 So.2d at 647; Preston v. State, 531 So.2d 154, 160 (Fla.1988); Wuornos v. State, 644 So.2d 1012, 1020 at n. 5 (Fla.1994). As to claim (12) concerning Walker's simple majority claim, see Wuornos v. State, 644 So.2d 1012, 1020 n. 5 (Fla.1994); James v. State, 453 So.2d 786, 791-92 (Fla.1984); and concerning the absence of written findings claim, see Wuornos; see also Hildwin v. Florida, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989).
[5] This case is clearly distinguishable from those cases upon which Walker relies. See, e.g., Brewer v. State, 386 So.2d 232 (Fla. 1980) (confession involuntary where police threatened defendant with electric chair, implying they had power to reduce charge against him and that confession would lead to lesser charge and told defendant he might not be sentenced to life if he confessed but assured him that he would be convicted and probably would not receive a fair trial); State v. Sawyer, 561 So.2d 278, 290-91 (Fla. 2d DCA 1990) (confession involuntary where it was product of enforced sleeplessness, 16-hour serial interrogation with no meaningful breaks, scenario of misleading questions, denial of requests to rest, refusal to honor defendant's Miranda rights and use of defendant's history of blackouts to undermine his reliance on his own memory).
[6] Moreover, even if it could have been error to admit this evidence, the error would be harmless. See Brown v. State, 443 So.2d 194 (Fla. 3d DCA 1983) (serologist's test which showed that defendant was included in large group of general population was either admissible and relevant or harmless error).
[7] For purposes of clarity, we note at the outset that this point on appeal involves several interrelated but distinct claims: (1) the improper injection of future dangerousness into the proceeding as discussed below; (2) denial of due process by (a) prohibiting the defense from effectively rebutting the "future dangerousness" allegation and (b) creating artificial uncertainty regarding Walker's sentencing alternatives to the death penalty by needlessly postponing their determination until after the jury's recommendation; and finally, (3) violation of the eighth amendment by prohibiting the jury from considering relevant mitigating evidence and thereby undermining the reliability of the sentencing proceedings.
[8] Contrary to the State's assertions, this issue is preserved for appellate review even though Walker did not request a curative instruction after his objection was sustained and motion for mistrial denied. So long as the defendant makes a timely specific objection and moves for a mistrial, as Walker did here, a curative instruction need not be requested. Spencer v. State, 645 So.2d 377, 383 (Fla. 1994); Rimes v. State, 645 So.2d 1080 (Fla. 3d DCA 1994) (curative instruction only would have accentuated prosecutor's question inviting improper testimony).
[9] Contrary to the State's assertions, this claim has been preserved for appellate review. The trial court knew at the time Walker's motion was argued that Walker already had requested sentencing on his noncapital felony convictions prior to the penalty phase trial. As the record reflects, when the prosecutor remarked during argument on the motion, "what defendant is asking you to do, is make your decision as to the other known non-capital [sic] offenses and decide without a PSI what you would impose on these sentence[s]," the court responded, "I understand that but for purpose[s] of [this motion] he is waiving most of these, he is waiving presentence investigation." Walker's claim was specifically set out in his written motion and the trial court understood his request at the time the motion was argued.
[10] This Court previously has rejected Walker's related claim that the trial court erred in precluding him from calling as a penalty phase witness a Department of Corrections (DOC) employee to testify as to Walker's actual term of incarceration. King v. Dugger, 555 So.2d 355, 359 (Fla.1990) (finding no error in excluding testimony of DOC employee that defendant would, in fact, serve his entire minimum mandatory term).
[11] We note also that the Legislature has remedied any possible uncertainties harbored by penalty phase juries regarding a defendant's ineligibility for parole when it amended section 775.082(1) to provide that defendants facing the death penalty pursuant to section 921.141 for crimes committed on or after October 1, 1995 shall be punished by death or life imprisonment and shall be ineligible for parole. § 775.082, Fla. Stat. (1995).
[12] Walker's related assertion that the trial court erroneously failed to consider in mitigation that these murders arose out of a domestic dispute is without merit. This Court had never treated "domestic dispute" cases as categorically different than other death cases and the fact that a case is "domestic" in nature is not, in and of itself, mitigating. In any event, this case is distinguishable from other domestic disputes in that, unlike the typical domestic case, the evidence here does not suggest that the murders were the result of a sudden, emotionally charged fit of rage or anger.